UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------ x
UNITED STATES OF AMERICA        :

                             :

       -v-                 :       11 Cr. 300 (JSR)

                             :

DAVID ROSEN,              :       FINDINGS OF FACT AND
                             :       CONCLUSIONS OF LAW

          Defendant.       :
------------------------------------ x

JED S. RAKOFF, U.S.D.J.

      This is a sad, even tragic case, as it reveals how a widely-admired hospital administrator who diligently sought to better the health care of impoverished communities nonetheless chose to entangle himself in the bribing of state legislators.

    Defendant David Rosen stands charged with engaging in a corrupt scheme to bribe three New York legislators -- former New York State Assemblyman Anthony Seminerio, New York State Assemblyman William Boyland, Jr., and New York State Senator Carl Kruger -- in order to benefit the MediSys Health Network ("MediSys"), of which Rosen was the Chief Executive Officer for over three decades.  Specifically, the Superseding Indictment ("Indictment") charges Rosen with funneling nearly $600,000 of MediSys' funds into Seminerio and Boyland, Jr.'s pockets by means of sham consulting contracts, and directing lucrative MediSys contracts to entities in which Seminerio and Kruger had a financial interest.  In exchange for these bribes, according to the Indictment, Seminerio, Boyland, Jr., and Kruger each agreed to exploit their positions as elected state legislators to

take official acts benefitting Medisys as specific opportunities to do so arose.

The matter was tried before this Court a few weeks ago. Having now carefully reviewed all of the evidence, including the in-court testimony of twenty-nine witnesses and the several hundred exhibits that were received in evidence at trial, the Court hereby concludes, based on the findings of fact and conclusions of law set forth below, that David Rosen is guilty beyond a reasonable doubt of all remaining Counts of the Indictment of which he is charged.

By way of background, on April 7, 2011 a grand jury returned an eleven-count Indictment against Rosen and various other defendants, including Boyland, Jr. and Kruger.[1] By Stipulation and Order dated April 29, 2011, Rosen was severed, on consent, from the other defendants. Thereafter, both sides elected a bench trial on the seven counts of the Indictment in which Rosen is charged. The trial began on July 25, 2011, and continued through August 12, 2011. In the process, the Court, for the reasons stated from the bench, see trial transcript ("Tr.") at 1592, dismissed Count 3, and the Government voluntarily dismissed Count 4. Id.

_____

[1] Co-conspirator Seminerio, who was previously convicted of other charges, died in prison in January, 2011. The findings of fact and conclusions of law set forth below are in no way binding on the remaining defendants, who have not yet been tried and who are presumed innocent until and unless the Government proves their guilt at trial beyond a reasonable doubt. Boyland, Jr. is to be tried by a jury beginning November 1, 2011 and the other defendants are to be tried by a jury beginning January 17, 2012.

The remaining counts (counts 5-9) charge Rosen with committing and conspiring to commit "honest services fraud," in violation of 18 U.S.C. §§ 1341, 1343 & 1346, and of conspiring to commit "federal programs bribery," in violation of 18 U.S.C. §§ 666(a)(1)(B) & (a)(2), and "Travel Act bribery," in violation of 18 U.S.C. § 1952(a)(3).

More specifically, Counts 5 and 6 charge Rosen with devising, and executing by use of the mails and interstate wires, a scheme to bribe Seminerio, Boyland, Jr., and Kruger, and thereby deprive New York State and its citizens of their legislators' honest services, in violation of 18 U.S.C. §§ 1341, 1343, 1346. The federal mail and wire fraud statutes make it a federal crime to use the mails and interstate wire communication to execute a "scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises." 18 U.S.C. §§ 1341, 1343. Pursuant to 18 U.S.C. § 1346, "depriv[ing] another of the intangible right of honest services" is a species of "fraud" under these statutes; and while the "right to honest services" has been held unconstitutionally vague in some respects, its core application to bribery and kickback schemes remains intact. See Skilling v. United States, 130 S. Ct. 2896 (2010). To meet its burden of proof with respect to these Counts, the Government must prove, beyond a reasonable doubt, that Rosen intentionally engaged in

3

a fraudulent scheme to deprive New York State and its citizens of their right to the honest services of their legislators, and that the mails or interstate wires were employed in furtherance of the scheme. See United States v. Rybicki, 354 F.3d 124, 145 (2d Cir. 2003).

Count 8 charges Rosen with conspiring with at least one other person to commit mail and wire fraud in connection with the bribery of Boyland, Jr.  To meet its burden of proof as to this charge, the Government must prove, beyond a reasonable doubt, that Rosen intentionally agreed with at least one other person to bribe Boyland, Jr., in the manner charged in Counts 5 and 6, and that at least one of the members of the conspiracy committed at least one overt act in furtherance of that conspiracy.  See United States v. Snype, 441 F.3d 119, 141 (2d Cir. 1998).

Counts 7 and 9 charge Rosen with conspiring with at least one other person to bribe Seminerio (Count 7) and Boyland Jr. (Count 9), either in violation of 18 U.S.C. § 666(a)(2)[2] and/or in violation of 18 U.S.C. § 1952(a)(3).  Regarding the conspiracy to violate § 666(a)(2), the Government must prove beyond a reasonable doubt that Rosen engaged in a conspiracy to corruptly give or offer anything with a value of at least $5,000 to an agent of the State of New York, with the intent to influence or reward that individual "in connection

---

[2] These counts also allege a conspiracy to violate 18 U.S.C. § 666(a)(1)(B), but this is more directed at the solicitation of the bribes by the recipients and need not be considered here.

with his official duties, see 18 U.S.C. § 666(a)(2)[3].  As to the
conspiracy to violate §1952(a)(3), the Government must prove beyond a
reasonable doubt that the defendant intentionally entered into a
conspiracy to travel in interstate commerce or to use or cause to be
used the mails or any interstate facility to further the making of
bribes to, respectively, Seminerio and Boyland, Jr. in violation of
New York State Penal Law § 200.00.[4]

Additionally, as to each of the foregoing Counts, the Government
must prove, but only by a preponderance of the evidence, that acts
constituting the crime charged occurred within the Southern District
of New York.  See United States v. Tzolov, 642 F.3d 314, 317 (2d Cir.
2011).

---

[3] It is also an element of this statute that during the period of the
bribe the governmental entity in question -- here, New York State --
receive "in any one year period, benefits in excess of $10,000 under
a Federal program." See id. § 666(b).  Because this element was not
disputed, it was not much discussed by counsel but was, nonetheless,
proved by the Government beyond a reasonable doubt. See, e.g., Gov.
Ex. 2329; Tr. at 284, 525, 900; see also, e.g., Def. Ex. 829
(discussing the billions of dollars in federal grants received by New
York State as part of the Medicaid program).

[4] This section provides, in pertinent part, that:

> A person is guilty of bribery in the third degree when he
> confers, or offers or agrees to confer, any benefit upon a
> public servant upon an agreement or understanding that such
> public servant`s vote, opinion, judgment, action, decision or
> exercise of discretion as a public servant will thereby be
> influenced.

N.Y. Pen. L. § 200.00.

With the foregoing requirements in mind, the Court finds the pertinent facts to be as follows:[5]

At all times relevant, David Rosen was the CEO of MediSys and its constituent hospitals.  Tr. at 42.  MediSys owns and operates several hospitals in Queens and Brooklyn, including Jamaica Hospital Medical Center ("Jamaica Hospital" or "Jamaica"), Flushing Hospital, and Brookdale University Hospital and Medical Center ("Brookdale Hospital" or "Brookdale").  Id. at 42-43.

Well prior to the time of the conspiracies here alleged, Rosen became aware of Seminerio's importance to Jamaica Hospital's financial health and continued existence.  In 1976, Rosen became CEO of Jamaica Hospital, which was then a stand-alone entity.  See id. at 42.  Shortly thereafter, the Health Systems Agency of the City of New York ("HSA") publicly recommended that Jamaica discontinue operating as a hospital and be converted to a smaller-scale clinic.  Id. at 1148.  In response to the HSA's announcement, Rosen helped lead a concerted, community-based campaign in support of Jamaica's continuing to operate as a fully-functioning hospital.  Id.  This campaign resulted in, among other things, a public hearing at which

---

[5] These findings of fact reflect, among other things, the Court's assessments of the demeanor and reliability of each of the witnesses and the Court's drawing of reasonable inferences from the testimony it found credible and persuasive.  Although transcript citations are given for many of the facts found, these citations are not intended to be exclusive.  In many instances, moreover, the Court drew important inferences from a multitude of circumstantial facts, and it would be impossibly burdensome to list all such circumstances supporting each such inference.

Assemblyman Seminerio voiced his strong support for Jamaica.  Id. at 1149.  The HSA's recommendation was never acted upon, and Jamaica survived intact.

Subsequently, in 1985, the New York State legislature adopted, and Governor Mario Cuomo signed into law, the "Secured Hospital Financing Program."  Id. at 1154.  This legislation -- which was drafted, in part, by Jamaica Hospital's outside attorney and lobbyist, George Kalkines -- was principally sponsored by Seminerio. Id. at 1151.  Seminerio also played a critical role in recruiting legislative co-sponsors for the bill, shepherding the bill through the requisite legislative committees, and persuading Governor Cuomo, who was initially skeptical, to sign the legislation.  Id. at 1149-1154.

Through the program created by that legislation, a small number of financially distressed hospitals were able to issue bonds guaranteed by New York State.  Id. at 1555.  In 1987, Jamaica became one of the first hospitals to benefit from the program, obtaining $105 million in secured financing to rebuild and revitalize its operations.  Id.  Rosen and the rest of Jamaica's senior management team -- comprised of Mounir Doss, the Chief Financial Officer, and Bruce Flanz, the Chief Operating Officer -- chose to use the financing to pay Jamaica's debts, purchase new equipment, and completely reconstruct the hospital's physical premises.  Id. at

7

1555-57.  This latter project resulted in what Flanz described as a "virtually new replacement hospital," with, among many other things, a new emergency department, new operating rooms, and more in-patient capacity.  Id. at 1555.  Moreover, because the hospital reconstruction project was completed under budget, Jamaica decided to use the remaining bond financing to build, adjacent to the old hospital, a completely new 130,000 square foot building, offering psychiatry, traumatic brain injury, and ambulatory care services. Id. at 1555-56.

It was obvious to Rosen that Seminerio was materially responsible for garnering the State support that helped Rosen to transform Jamaica from a struggling operation to a modern and financially-stable enterprise.  Indeed, in recognition of Seminerio's pivotal role, Jamaica Hospital, at the 1987 groundbreaking for the new hospital, placed a "very big sign over the entrance to the . . . ceremony" stating "Welcome to Seminerio City."  Id. at 907, 1156.

Furthermore, in the years that immediately followed, Seminerio continued to demonstrate an active and effective interest in assisting the hospital.  For instance, in 1998, Seminerio alerted Jamaica to the availability of a piece of property at 90-09 Van Wyke Expressway ("90-09") -- a 20,000 to 25,000 square foot building nearby the Hospital that Rosen had hoped to acquire and use for hospital programming.  Id. at 909-910, 1158-59.  Seminerio then

assisted Jamaica in the acquisition of 90-09, by, inter alia,
identifying "people who could be helpful in the acquisition" and
setting up meetings with those individuals on Jamaica's behalf.  Id.
at 910; see Defendant's Exhibit ("Def. Ex.") 406.  As another
example, starting in the late 1990s and continuing thereafter,
Seminerio assisted Jamaica in its efforts to construct a parking
garage to alleviate a parking shortage around the Hospital.  Tr. at
1158, 1161.  Although Seminerio's assistance with respect to such
local matters did not inherently relate to his official duties as an
Assemblyman, he made them so by expressly using his position as an
elected State official to advance such assistance, e.g., by using his
official letterhead stationary to write in support of Jamaica's
position in these matters.  See Tr. at 951-52.

Eventually, however, Rosen learned that Seminerio's continued
support for Jamaica and MediSys would come at a price.  Specifically,
in the late 1990s, Seminerio suggested to Rosen that Seminerio be
retained as a "consultant."  Both from the way the consultancy was
initially handled and from subsequent events, detailed below, the
Court infers that Rosen understood, even at the outset, that the
"consulting" arrangement was a disguised bribe, necessary to assure
Seminerio's legislative support for MediSys; but Rosen nonetheless
willingly chose to enter into the arrangement.

As a first step in the arrangement, Rosen directed Steven Bory -
- the Chief Executive Officer of Neighborhood Health Providers
("NHP"), a managed care company owned by MediSys -- to hire Seminerio
as a consultant, which Bory did through a written contract dated
November 11, 1998.  Id. at 396-401, 423-24; see Government Exhibit
("Gov. Ex.") 1100.  This agreement, which was never disclosed to
MediSys' Board of Directors, see id. at 912, was, however,
insufficient to satisfy Seminerio.  So, roughly six months later, on
April 16, 1999, Rosen himself, on behalf of Jamaica Hospital, signed
a written consultancy contract between Jamaica and Seminerio's
consulting front, MARC Consultants ("MARC"), whereby MediSys would
make regular payments to MARC (i.e. Seminerio), totaling
approximately $40,000 annually.  See Gov. Ex. 1102.

These contracts, on their face, were not necessarily unlawful.
The New York State legislature is a part-time body, and State
legislators are therefore permitted under New York law to engage in
outside employment, subject to a variety of limitations, including,
of course, a prohibition on receiving bribes.  See N.Y. Pub. Off. L.
§§ 73-77.  However, for reasons delineated below, the Court concludes
that the main purpose of these written contracts was to provide a
plausible "cover" for the bribes Rosen intended to funnel to
Seminerio.  Thus, while both contracts piously stated that Seminerio
"shall not provide any consulting services in respect of any unit or

10

agency of the State of New York, including the state legislature,"
Gov. Exs. 1100, 1102, virtually every service Seminerio rendered for
MediSys was undertaken in his capacity as an Assemblyman.  Moreover,
while Rosen told Neil Phillips, Chairman of MediSys' Board of
Directors, that the Jamaica-MARC consultancy arrangement had been
vetted and approved by the New York State legislative ethics
committee, Tr. 908-909, 1599-1600, this was untrue, id. 1628, 1643;
see Gov Ex. 101, and there is no credible evidence that Rosen had a
good faith belief that this was so.  Indeed, the contract had been
drafted in less than half an hour by Barbary Arky, an attorney in
Kalkines' law firm, and then sent directly to MediSys, where it was
personally handled by Rosen.  See id. 1627-28.[6]

Even more tellingly, Rosen kept Seminerio's "consultancy"
entirely hidden from Joanne Ariola, MediSys' Director of
Intergovernmental Affairs, who was responsible for being MediSys'
primary "liaison with government officials . . . and quasi-government
agencies, such as . . . community groups," id. at 251 -- even though
she would have been the logical person to be to be involved in any
genuine consulting by Seminerio.  Tr. at 264, 267.

---

[6] The Court rejects the suggestion of Rosen's counsel, see Tr. at
1827, unsupported by any material, credible evidence, that it was
Kalkines who asserted that the contract had been approved by the NYS
legislative ethics committee and that Rosen innocently relied on what
Kalkines told him.  Even assuming arguendo that Kalkines was the
original source of this fabrication, it begs credulity to believe
that Rosen would not have questioned Kalkines for details in this
regard and thereby learned the truth.

The simple truth is that Seminerio never rendered any material consulting services to MediSys at any time here relevant, and Rosen well knew this.  Rather, Seminerio, in return for the "consultancy" payments, and often at Rosen's direction, used his Assembly position to help the MediSys hospitals obtain or attempt to obtain important state funding.

At trial, Rosen, through his counsel, attempted to dispute this by pointing to some minor matters not directly involving the State as to which Seminerio rendered assistance to MediSys.  For example, as to local issues, Seminerio helped Jamaica to resolve a zoning dispute arising from the Hospital's opening of the Brady House -- a long-term living residence for patients with traumatic brain injuries located behind the Hospital -- by speaking to members of a local community planning board on Jamaica's behalf.  Id. at 943-44.  As another example, in and around 2000, Seminerio, at Rosen's request, several times contacted the New York City Fire Department (the "NYFD") to request an expansion of the number of ambulance districts that Jamaica could serve.  Id. at 948-50.

Even with respect to such local matters, however, Seminerio held himself out to third parties as acting in his official capacity as a State Assemblyman, never disclosing his financial connection to MediSys.  See id. at 951-52.  In a letter to the NYFD, for instance, Seminerio stated that his desire to assist Jamaica was driven by his

12

concern for the "health and welfare of . . . my constituents."  Gov.
Ex. 1248.  Seminerio wrote this letter, like all the letters he sent
at Rosen's behest, on his official legislative letterhead stationary,
signing it in the space directly above his title at the time,
Assistant Majority Leader of the New York State Assembly.  See id.
Indeed, there is no indication that Seminerio ever identified himself
to any third party with whom he interacted on MediSys' behalf as
anything other than a State legislator.  See Tr. at 945.[7]

In fact, the only times in which Seminerio appears to have ever
used MARC letterhead in relation to matters on which he was assisting
MediSys were in his invoices to Rosen demanding payment.  See Gov Ex.
1116.  It is also noteworthy that, in contrast with the invoices that
Rosen received from his lawyers and lobbyists, Seminerio's
"consulting" invoices were not itemized in any way.  Compare Gov. Ex.
224 with Gov. Ex. 1112.

Rosen, the Court infers, never believed that any of these
efforts by Seminerio were either a form of "consulting" or remotely

---

[7] The same was true of those few occasions when Seminerio
assisted Rosen on "federal" matters.  Thus, in 2005, Seminerio, in
his capacity as a State Assemblyman, placed a phone call to an
official at the federal Department of Housing and Urban Development
in support of Jamaica's application for federal financing to build a
new nursing home.  Id. at 943.  According to Flanz, this intervention
was instrumental in "caus[ing] the application to move forward."  Id.
As another example, in or around 2005, Seminerio introduced Rosen to
a former New York City official who assisted Jamaica in applying for
a federal grant related to emergency preparedness and bioterrorism.
Id. at 943-44.

justified the total of more than $400,000 that Seminerio ultimately received from his consulting agreements with MediSys.  What mattered to Rosen was Seminerio's ability to assist MediSys on matters in Albany that were crucial to Jamaica's financial survival, matters in which Rosen himself was very deeply involved.  Tr. at 1604; see Gov. Ex. 1320R; see also Gov Exs. 221 & 224 (showing that Rosen personally approved MediSys' lobbying expenses).  Rosen's two primary concerns vis-à-vis Albany were the New York State budget and the State's ability to facilitate (or impede) MediSys' continued growth.  See Def. Ex. 2501 (minutes of MediSys and Jamaica Board meetings showing the dozens of times these issues were raised by Rosen at those meetings).  As to the State budget, Rosen correctly understood that MediSys was fundamentally dependent on the vicissitudes of the New York State budgeting process, given that the State is one of MediSys' principal sources of funding.  See Tr. at 237, 1604.  Accordingly, at various points in the 2000s, when the State legislature considered cuts to Medicaid that would have severely impacted MediSys' bottom-line, Rosen actively coordinated MediSys' efforts in Albany to lobby against those cuts.  See id. at 237.  State funding was especially critical to MediSys' survival, given that MediSys continued to face "tremendous [financial] pressures" and be "in dire need of funds" throughout the 2000s.  See Tr. at 1618.

14

Separately, Rosen understood that MediSys' continued growth was also substantially dependent on its ability to secure the assistance of New York State. See id. at 914-917, 1604. This understanding developed over Rosen's decades of experience seeking and obtaining official State assistance for MediSys' growth. As noted above, in the 1980s, the State gave MediSys $105 million in secured financing to completely rebuild and revitalize Jamaica Hospital. Tr. at 1555. Moreover, throughout the 1980s and 1990s, the State Department of Health provided MediSys with Certificates of Need that allowed it to expand in a variety of ways. Id. at 1062. And critically, in the late 1990s and early 2000s, New York State helped MediSys grow by enabling and encouraging it to add two financially distressed hospitals, Brookdale Hospital and Flushing Hospital, to its network. Id. at 1062-63, 1172. Rosen firmly believed that MediSys' continued expansion, and attendant ability to "control[] a piece of the market," was crucial to its ability to survive in a competitive environment. Gov. Ex. 1320R.

On both of these issues of central concern to Rosen -- the State budget and MediSys' expansion -- Seminerio provided substantial assistance to MediSys in the form of official acts. As to Rosen's desire to expand MediSys, Seminerio, at Rosen's express request, co-sponsored legislation in 2006 that would have allowed Jamaica to restructure and increase its debt obligations with the backing of New

15

York State, thus giving MediSys the financial means to acquire the
Caritas Hospitals.  Tr. at 916; see Gov. Ex. 1320R.  Subsequently,
after this bill fizzled in the State legislature, see Tr. at 916,
Seminerio, at the behest of Rosen, called Dennis Whalen -- an
official in the New York Department of Health whom Rosen understood
to be highly influential in terms of determining the fate of the
Caritas Hospitals -- and advocated on behalf of State support for
MediSys' acquisition of those hospitals.  Gov. Ex. 1306R; Tr. at 309-
311.  During this call, Seminerio represented that he was speaking in
his capacity as an elected official whose sole interest in the matter
was advancing the welfare of his constituents.  See Gov. Ex. 1306R;
Tr. at 311.  The day before, however, Rosen had complained to
Seminerio that Whalen "has not been such a great friend to us . . .
[o]ver the years," which prompted Seminerio to state that he would
"break [Whalen's] balls."  Gov. Ex. 1305R.  Accordingly, immediately
after he called Whalen on July 10, 2008 to advocate for MediSys'
acquisition of the Caritas Hospitals, Seminerio called Rosen to
inform him of his advocacy and boast about his influence with Whalen.
See Gov. Ex. 1307R.  During this conversation, Rosen confirmed that
"I need your help with" the Caritas acquisition, and expressed to
Seminerio that he, along with Kruger, were "my two guys who know what
to say" in Albany.  Id.  Rosen then stated that "I'll prep you" on

16

how and when to act in MediSys' interests with respect to State matters.  Id.

With respect to the State budget, Seminerio assisted MediSys' interests in a variety of ways during the life of the sham consultancy.  For instance, on August 12, 2008, Seminerio called Rosen to report that he had "just got off the phone, yelling and screaming to [Speaker of the New York State Assembly Sheldon Silver] about [proposed budget] cuts" that would have affected MediSys, and that Silver had promised him that the cuts would not occur.  Gov. Ex. 1309R.  Rosen responded, first, with relief and gratitude to Seminerio and, second, by expressing that Silver had been "pissing me off most of the time."  Id.  Seminerio responded that if "you go through me, you won't be pissed off."  Id.  As another example of the budget assistance Seminerio gave to MediSys, Seminerio, in early 2006, arranged a meeting for Rosen with John Cahill -- Chief of Staff to Governor George Pataki -- with regard to MediSys' effort to persuade New York State to forgive a $27 million loan.  Tr. at 242; Gov. Exs. 1222, 1225B.

Rosen's procurement of Seminerio's assistance to MediSys in Seminerio's capacity as a State Assemblyman extended to other official State matters as well.  The events of a single day, April 7, 2006, are illustrative.  First, on that date, Rosen wrote a letter to Seminerio asking for his assistance in advancing MediSys' application

17

to be named an approved provider of managed long-term care by New York State.  See Gov Ex. 1245A.  Rosen noted in his letter that "[e]stablishing a managed long-term care program will require the assistance of the legislature through action by the senate or the Assembly in naming [MediSys] as one of the approved provider organizations."  Id.  In response, Seminerio reported to Rosen that he brought the matter to Speaker Silver's attention, who promised to "look it over."  Gov. Ex. 1224.  Also on April 7, 2006, Rosen sent a separate letter to Seminerio regarding a long-running dispute between Jamaica and Oxford Health Plans ("Oxford") over Oxford's health insurance rates, a dispute that had resulted in a protracted lawsuit between the two entities.  See Gov. Ex. 2501; see also Def. Ex. 2501 (showing that Rosen reported on the dispute to the Jamaica and MediSys boards on over two dozen occasions between 2005 and 2008). In this second letter, Rosen expressed his belief that Oxford had engaged in criminal wrongdoing in relation to the dispute, and requested that Seminerio intervene on MediSys' behalf with the Queens District Attorney.  Gov. Ex. 1246A.  The same day that Rosen made these two requests for official assistance to Seminerio, April 7, 2006, Rosen received a message from his secretary informing him that Seminerio had called "looking for his check for [MARC]."  Gov. Ex. 1120.  Rosen, far too sophisticated a man not to see the connection,

18

responded to his secretary that "I haven't seen [the check] but we better find it." Id.

From May 2000 to February 2008, Jamaica and NHP made payments totaling $410,000 to MARC, of which the greater benefit, the $330,000 in payments from Jamaica, were personally processed through Rosen. Gov. Exs. 1115 & 1116. Indeed, over the course of this period, it was customary for Seminerio to call Rosen directly seeking payment. See, e.g., Gov. Ex. 1118A. In one such instance, recorded by the Government on April 23, 2008, Seminerio went directly from requesting his check to boasting about his influence with respect to the New York State budget and, in particular, with Senator Joseph Bruno, the former Republican leader of the New York State Senate. Gov Ex. 1302R. As to his rapport with Bruno, Seminerio stated that it was "that kind of relationship you can't buy for a million dollars," to which Rosen responded "that's absolutely right . . . you're the only guy who knows how to move and shake." Id. Soon after that exchange, Rosen closed the conversation by stating "let me go shake out your check." Id.[8]

Separately, from 1999 to 2008, Rosen directed MediSys to enter into lucrative contracts with a variety of third-party vendors with

_____

[8] The tone of the numerous conversations between Seminerio and Rosen that the Government recorded is itself revealing and probative. In both his assertion of legislative influence and his demand for consulting payments, Seminerio's tone is brazen. Rosen, while more guarded, makes clear, not only in words but in intonation, that he fully understands the connection and that he will see to it that Seminerio gets his money. See, e.g., Gov Ex. 1302R.

which Seminerio had a financial interest.  For instance, for a number
of years in the late 1990s and early 2000s, Jamaica and Brookdale
both contracted with Evenflow, an ambulette company, to bring
patients with certain physical disabilities to the hospitals.  Tr. at
1046.  Jamaica encountered significant problems with the quality of
Evenflow's services, leading Dr. Angelo Canedo -- Vice President for
Rehabilitation Services at a number of MediSys hospitals -- to
instruct his staff to use alternative vendors.  Id. at 185-187.  At
some point around this time, Rosen's lieutenant, Bruce Flanz,
MediSys' Chief Operating Officer, who was well-aware of the
complaints surrounding the quality of Evenflow's services, id. at
1249, 1065, spoke with Fred Beekman (Vice President of Ambulatory
Care at MediSys) on the matter of Evenflow, telling Beekman that "he
didn't have to remind [Beekman] how important [Seminerio] was to this
institution." Id. at 1062.  Soon after his conversation with Flanz,
Beekman also received a call from Seminerio in which Seminerio
stated, in expletive-laden terms, that MediSys' failure to direct
business to Evenflow was "killing him" and that he was "losing money"
because of it.  Id. at 1048.  Beekman understood Flanz's call as an
implicit instruction to direct more of MediSys' ambulatory business
to Evenflow, an instruction which he faithfully carried out.  Id. at
1063.  Seminerio also complained to Rosen and Flanz about the
Evenflow "account problem" and, in the same breath, promised them

20

that if MediSys "needed money" he "would go to bat for [MediSys] to
get some funding." Gov. Ex. 1005. Rosen later called Canedo with
regard to the Evenflow contract, instructing him to "fix it and make
it happen." Tr. at 187; see also id. (noting that it was very rare
for Canedo to receive such instructions from Rosen). Canedo
interpreted this as a direction to reinstate Evenflow as a preferred
vendor with respect to ambulette services. Id.[9]

Also probative of Rosen's intent with respect to MediSys'
various financial connections to Seminerio was his failure to reveal
those connections in certain State and City filings. In order to do
business with the City of New York (the "City") or New York State,
prospective vendors must complete a vendor responsibility
certification -- known as a "Vendex" form in the case of the City,
and a "VQR" form in the case of the State -- before the vendor's
contract can be finally approved. Tr. at 582. On a number of
occasions throughout the course of the 2000s, MediSys entered into

---

[9] However, given his belief that Evenflow's shortcomings -- most
notably, its frequent inability to transport patients in a timely
manner -- "put patients at risk" of respiratory and other
complications, Canedo only followed Rosen's directive "halfway." Tr.
at 187-88. Specifically, Canedo responded to Rosen's call by
instructing his staff to use Evenflow as a vendor with respect to
patients that were sufficiently high functioning that their care
could not be impaired by using, what he viewed as, a substandard
ambulette service. Id. at 188. Canedo's instruction predictably led
his staff to "essentially" discontinue using Evenflow. Id. at 222.
At some point thereafter, Canedo formally terminated MediSys'
contract with Evenflow. Id. Rosen made no further interventions in
the matter, though he did request to be kept abreast of any
developments with respect to the contract. See Gov. Ex. 1012.

contracts with the City or the State, and consequently was required
to complete and submit Vendex and VQR forms.  Id. at 593-616.  Ann
Corrigan, Payroll Director for MediSys, had primary responsibility
for completing these forms.  Id. at 582-84.  Prior to 2006, Corrigan,
in consultation with the relevant MediSys departments, would do this
by filling out the forms to the best of her ability and then
submitting them to MediSys' general counsel's office for processing,
after which Rosen would personally review and sign the forms.  Id. at
582-583, 587.  By 2006, however, acting at the direction of Margo
Johnson, MediSys' General Counsel, Corrigan took a more active role
in ensuring the accuracy of MediSys' certifications to the City and
the State.  Id. at 584, 601, 616.  Specifically, when a Vendex or VQR
form needed completion, Corrigan, after collecting the necessary
background information to the best of her abilities, would schedule a
personal, one-on-one meeting with Rosen, and the two would "review
each question thoroughly" together to ensure the form was accurate in
all respects.  Id. at 587.  If any uncertainty arose as to the
correct answer to a given question, either Rosen or Corrigan would do
follow-up research on the issue to resolve the uncertainty before
Rosen could sign and submit the completed form.  See id. at 602.
During this period of heightened scrutiny, from around 2006 to 2008,
the process of completing a single Vendex or VQR form would typically
take around two months or longer.  Id. at 603.

22

Each Vendex and VQR form includes a question asking whether
"there are any individuals now serving in a . . . consulting capacity
to the submitting vendor . . . who now serve [or have recently
served] . . . as . . . an elected or appointed official."  See Gov.
Exs. 50, 51, 53, 55, 56.  Corrigan specifically discussed this
question with Rosen in their reviews of the Vendex and VQR forms, and
in one instance, brought to Rosen's attention that MediSys was
required to disclose that a new employee, Ariola, had formerly held a
mid-level appointed position in the City's Mayor's Office.  Tr. at
601, 612.  The Vendex forms further include a certification page in
which the signatory certifies that he has "supplied full and complete
responses to each item . . . to the best of my knowledge" and his
understanding that "[a] materially false statement willfully or
fraudulently made in connection with this questionnaire . . . may
subject the person making the false statement to criminal charges."
See, e.g., Gov. Exs. 56, 64.  However, from 2004 to 2008, Rosen
signed numerous Vendex forms -- and, in one instance, caused the
submission of a VQR form that was signed, but not reviewed, by Flanz
because Rosen was on vacation, see Tr. at 615-17 -- in which he
failed to disclose MediSys' purported "consulting" relationship with
Seminerio.  See Gov. Exs. 50, 53, 55, 64.  Given Rosen's intimate
knowledge of the arrangements with Seminerio, the Court finds that
these omissions were intentional and bespeak an effort on Rosen's

23

part to conceal arrangements with Seminerio that he knew could not bear scrutiny because they were thinly-disguised bribes.

Relatedly, in Seminerio's financial disclosures to New York State, Seminerio never disclosed that he or any entity he controlled was receiving payments from MediSys. See, e.g., Gov. Ex. 416. Rather, Seminerio merely reported the receipt of unidentified sums of income from his job as a consultant at MARC. Id.

Once having entered into a corrupt understanding with Seminerio, Rosen found it easier to enter into corrupt relationships with Boyland, Jr. and Kruger.

The Court first considers Rosen's dealings with Boyland, Jr. In the late 1990s, Boyland, Jr. -- whose father, William Boyland, Sr. (also known by his middle name, Frank), was a long-serving Assemblyman in the State Legislature -- began working full-time as a "marketing associate" for Brookdale Hospital in one its ambulatory care clinics, Urban Strategies. Tr. at 651. Rosen had no role in the hiring of Boyland, Jr. by Urban Strategies, and, indeed, Brookdale had not yet been acquired by MediSys at that time. See id. As a marketing associate, Boyland, Jr. worked on community outreach for Urban Strategies, which entailed attending community events (such as health fairs) and visiting community organizations (such as churches and schools), in an effort to recruit patients for the clinic. Id. at 652. By all accounts, Boyland, Jr. was a less than

24

satisfactory employee, and he frequently did not show up for work.
See id. at 656-58.   Nonetheless, by 2003, he was earning $35,000 a
year.   See id. at 1590, 1768.

In February 2003, after MediSys' acquisition of Brookdale,
Boyland, Jr. was elected to the State Assembly seat that had
previously been held by his father.   Id. at 661.   After his election,
even though he continued to collect a full salary from Urban
Strategies, he pretty much stopped coming to work.   Id.   Instead of
firing Boyland, Jr., Rosen, who by this time had already entered into
illegal connections with Seminerio, requested in June 2003 the
assistance of by-now-Assemblyman Boyland Jr. in lobbying a State
Department of Health official with respect to MediSys' application
for the requisite State approval for MediSys' planned establishment
of new diagnostic and treatment center.   Gov. Ex. 2300.

Boyland, Jr., for his part, had become increasingly resistant to
demands by supervisors at Brookdale that he at least had to "punch
in" at Urban Strategies if he wanted to continue to receive his
salary.   In the summer of 2003, he arranged for his father to call
Rosen and ask Rosen for some sort of accommodation in this regard.
See Gov. Ex. 2100A.   Rosen responded by directing Mounir Doss,
MediSys' Chief Financial Officer, to "get [Boyland, Jr.] off the
payroll . . . so he doesn't have to punch in" and pay him "the same
money as a consultant."   Gov. Ex. 2100B.   Although this took some

time to arrange, by April, 2004, MediSys was paying Boyland, Jr. the same salary as a "consultant" that he had previously been receiving as a full-time employee, i.e., $35,000 a year.  Tr. at 743-44.  He also received full payment for the interim period between November, 2004 and April, 2004, even though he was essentially a no-show employee during this period and no formal consulting agreement was in place.  Tr. at 743-44.

Over the next few years, Boyland, Jr. received a total of $175,000 in consulting payments from MediSys, ostensibly to perform community outreach and recruitment services for Urban Strategies. See Gov. Ex. 2105.  In truth, however, Boyland, Jr. did not perform any material community outreach or recruitment services for Urban Strategies during this entire period.  See Gov. Exs. 2200-2203 (lists created by Phoebe Lane, Brookdale's Director of Community and Government Affairs, cataloguing Brookdale's community outreach activities).  Indeed, among the community and outreach staff at MediSys, not a single person was even aware that Boyland, Jr. was supposedly consulting on such matters.  See Tr. at 637, 661-62, 696-97, 822-23; see Gov. Ex. 2103.  Instead, the relevant MediSys staff believed that, from at least November 2003, Boyland, Jr. was no longer affiliated with MediSys in any way, either as an employee or as a consultant.  See, e.g., Tr. at 661-62.

26

Instead, Boyland, Jr. earned the bribe being approved by Rosen by assisting MediSys through official acts taken in his capacity as an Assemblyman.  Most notably, during the State budgeting process, Boyland, Jr. made repeated requests for State funding to directly benefit MediSys and its hospitals.  For instance, on February 6, 2004, Boyland, Jr. sent a letter to Speaker Silver "requesting the allocation of three million dollars" to Brookdale Hospital for the purpose of "help[ing] this Institution provide quality health care." Gov. Ex. 2303.  As another example, the following year, on February 28, 2007, Boyland, Jr. made a similar funding request of $3 million for Jamaica.  Gov. Ex. 2305.  Some of these funding letters arose from specific requests by Rosen to Boyland Jr., and some were even drafted at least in part by Rosen himself -- with Boyland Jr.'s Assembly Office on at least one occasion calling Rosen to ask him to "send the necessary letter" requesting "$750,000 for patient billing" at Jamaica, "$1.5 m. for equipment and [Emergency Department] renovation" at Brookdale, as well as an unidentified amount for Flushing.  Gov. Ex. 2315.  None of those facilities were in Boyland, Jr.'s Assembly District, with Jamaica and Flushing being miles away. See Gov. Ex. 25.  To further the object of directing State funds to MediSys, Boyland, Jr. also coordinated meetings between himself, Rosen, and other State legislators, including Seminerio, to discuss the State budget.    See Gov. Ex. 2317, 2321, 2321A.

27

Separately, during this period, Rosen sought and received Boyland, Jr.'s assistance with respect to MediSys' effort to acquire the Caritas Hospitals. See Gov. Ex. 2306. For instance, in May 2005, Boyland, Jr. -- in his capacity as an Assemblyman but at Rosen's "urgent" request -- met with representatives of Local 1199, the healthcare workers union, in an effort to gauge its support for the MediSys acquisition. Id. After the meeting, Boyland, Jr. reported back to Flanz and Rosen the results of his meeting with the union. Tr. at 928-29.

As in the case of Seminerio, Rosen -- in both a Vendex form submitted to the City in 2004, and in a VQR submitted to the State in 2006 -- failed to disclose that Boyland, Jr. was being paid by MediSys. See Gov. Exs. 53, 64. Boyland, Jr., however, disclosed to New York State in his own financial disclosure forms that he was a paid consultant to Brookdale, "advis[ing] on community outreach," see Gov. Exs. 421-24, -- although he listed his income from MediSys as between $5,000 and $20,000, rather than the $35,000 he in fact received, see Gov. Ex. 425A. In 2007, Rosen, whether because he had become aware of Boyland, Jr.'s disclosures or otherwise, finally did disclose in a Vendex form that MediSys was paying Boyland, Jr. as a consultant. See Gov. Ex. 56. However, even in that disclosure, Rosen, to hide his previous failure to disclose, misrepresented to the City (and to Ms. Corrigan) that the consultancy began in January,

28

2006, rather than November, 2003, or at latest, April 2004.  See id.;
see also Tr. at 601-02.  A few weeks before the filing of the 2007
Vendex, an unidentified person directed Crinnion to falsify MediSys'
personnel records to make it look like Boyland, Jr. had not
transitioned from being a Urban Strategies employee to a MediSys
consultant until 2006 -- thus substantiating Rosen's false
certification to the City.  Tr. at 544-45.

Meanwhile, Rosen, having first succumbed to Seminerio's unlawful
proposals and then having helped orchestrate the corrupt relationship
with Boyland, Jr., found it easy to enter into an even more blatantly
illegal relationship with State Senator Carl Kruger.  Kruger, along
with three partners -- his two sons and an individual named Saul
Kalish -- ran a health care consulting firm called Adex Management
("Adex"), splitting Adex's profits equally among themselves.  Tr. at
1073.  In or around September, 2007, Adex entered into a contract
with a hospice care provider called Compassionate Care to assist it
in securing a hospice services contract with Brookdale, for which
Adex received a one-time payment of $10,000.  Id. at 1074.
Subsequently, in either November or December, 2007, Adex and
Compassionate Care entered into a retainer agreement by which Adex
received $5,000 a month to secure hospice contracts for Compassionate
Care as opportunities to do so arose.  Id.

29

In September, 2007, Kalish arranged a series of meetings between Rosen and Kruger at Brookdale "to discuss malpractice."  Gov. Ex. 3008-09.  At around the same time, Genevieve Sorenson -- the chief on-site administrator of the Schulman Schachne Institute ("SSI"), Brookdale's nursing home -- received several phone calls from Peggy Schwartz, Director of Marketing at Compassionate Care, during which Schwartz proposed that SSI and Compassionate Care enter into a business relationship.  Tr. at 1004.  Since 2001, SSI had contracted with a company called Hospice Care of New York ("HCNY") for hospice care services.  Id. at 1007.  Though Sorenson was happy with HCNY, she agreed to meet with Schwartz, and, on October 11, 2007, Schwartz gave Sorenson and other SSI staff a formal presentation on Compassionate Care.  Id.  Sorenson was sufficiently impressed by Schwartz's presentation that, on that same day, she initiated a contract review process -- the first step toward making Compassionate Care an SSI vendor -- which entailed filling out the relevant paperwork and sending it to MediSys' general counsel's office for review.  Id. at 1011-12; see Gov. Ex. 3104.  In February 2008, however, Flanz told Sorenson that MediSys would have only one hospice provider, and that that provider would continue to be HCNY.  Tr. at 1015.

Against this background, Kruger, by letter dated November 7, 2007, wrote to Rosen expressing his desire to help secure State

30

funding for Brookdale and Jamaica and requesting "a meeting with you
at your earlier convenience so that we may begin the process of
bringing this new project to fruition."  Gov. Ex. 3200.  In this
letter, Kruger also expressed his "hope" that "this allocation is
'Phase I' in our ongoing commitment to Brookdale" and Jamaica.  Id.
Very shortly thereafter, Kruger requested that Rosen approve the SSI-
Compassionate Care contract.  See Gov. Ex. 3201.

While this sequence was more than sufficient to send a message
to Rosen about the connection between Kruger's offer of official
assistance and Rosen's approval of the Compassionate Care contract,
Kruger, leaving nothing to chance, brought the connection to the
attention of Rosen's trusted subordinates as well.  For instance, on
November 15, 2007, Phoebe Layne sent an e-mail to Rosen reporting the
details of her recent phone conversation with Kruger, which stated
that:

> I spoke with Sen. Kruger re: $ for [Brookdale and Jamaica] as
> stated in his letter to you of Nov 7th . . . . He would like me
> to set a meeting with you to discuss all this - among other
> things.  As you may be aware, Carl has been trying to get us to
> enter into an agreement with Compassionate Care Hospice as a
> referral agency for hospice home care . . . there is a contract
> pending with legal and he is pushing for it to be signed and
> completed . . .

Gov. Ex. 3201.

Several months later, on March 20, 2008, Kruger made a visit to
Brookdale, ostensibly to distribute toys to children at the Hospital.
[Gov. Ex. 3301A].  At some point around this time, Rosen agreed that

31

he would seek to influence MediSys' internal contracting process so as to ensure that SSI awarded its hospice care contract to Compassionate Care. Accordingly, in the week following Kruger's visit to Brookdale, Rosen began a concerted effort to get the SSI-Compassionate Care contracted approved. On March 27, 2008, he sent an e-mail to Margo Johnson, MediSys' General Counsel, to inquire about the "Contract for Compassionate Care" because "Sen. Carl Kruger is following and I promised to get it done." Gov. Ex. 3301. The next week, on April 4, 2008, Johnson e-mailed Rosen informing him that Flanz had stated that "we are no[t] going forward" with the Compassionate Care contract, to which Rosen responded "We are going forward . . . I don't answer to Bruce. Get it to me for signature. Today." Gov. Ex. 3302. Less than an hour later, Rosen faxed Flanz the proposed contract between SSI and Compassionate Care, along with a note stating that "I have to do this - check it so I can sign + price." Gov. Ex. 3303.

Meanwhile, responding to Kruger's November 7, 2008 offer, Rosen developed two proposals for State funding to MediSys that Kruger would be well-positioned to help deliver. The proposals outlined requests for $350,000 in funding for a new digital mammography unit at Brookdale and $120,000 in funding for an expansion of Jamaica's cardiac data repository. Gov. Ex. 3202. On May 23, 2008, Rosen sent these proposals to Jason Koppel, Kruger's legislative chief of staff,

32

who then passed them onto Kruger.  See id.  In early July, 2008,
Rosen learned that Kruger had "c[o]me through for the 2 equipment
grants we requested," securing, from the Dormitory Authority of the
State of New York, $100,000 for Jamaica and $325,000 for Brookdale.
Gov. Exs. 3208; 3208A1.  Brookdale is located in Kruger's borough,
whereas Jamaica is not.  See Gov. Ex. 25.

Similarly, at or around the same time that Rosen first started
to push for MediSys to sign the Compassionate Care contract, and by
April 15, 2008 at the latest, Kruger agreed to assist MediSys'
efforts to acquire the Caritas Hospitals.  See Gov. Ex. 3215.  To get
Kruger up to speed on the matter, Rosen sent him a "packet containing
the reorganization plan" for the proposed acquisition.  Id.  By July,
2008, Kruger was actively engaged in promoting MediSys' interests
regarding Caritas.  See Gov. Ex. 3207.  This activity culminated on
August 6, 2008, when Kruger met with Governor David Patterson to push
for his support on the deal.  See Gov. Ex. 3225.  Rosen tightly
coordinated the strategy for this meeting, supplying Kruger with
extensive lists of talking points, which he urged Kruger "to digest
and make his own!," and which emphasized the purported public
benefits attendant to MediSys' expansion.  Gov. Ex. 3209.

Despite Rosen's insistence that the SSI-Compassionate Care
contract be approved, no action was taken on the contract by either
Flanz or Johnson for several months.  See Tr. at 970.  As a result,

33

it was Sorenson's impression that the contract with Compassionate
Care, which she had initiated, "was over."  Id. at 1017.
Nevertheless, in the months following Rosen's April 4, 2008 fax to
Flanz, during which Kruger was securing State funding for MediSys and
advocating for MediSys' expansion through official acts, Kruger and
his staff continued to press Rosen about the contract.  Indeed, at
least every few weeks from April to September, 2008, Kruger or
someone on his behalf contacted Rosen to follow-up on whether he "had
signed the contract."  See Gov. Ex. 3215; see also, e.g., Gov. Exs.
3203A, 3304, 3306, 3307, 3308A, 3209A, 3308B.  Moreover, in their
communications with Rosen, Kruger and his surrogates openly tied
their inquiries into the status of the Compassionate Care contract
with updates on the official assistance Kruger was providing to
MediSys.  See Gov. Ex. 3203A.

If Rosen were otherwise in doubt, the constant messages by
Kruger should have given him to fully understand that Kruger had a
financial interest in Compassionate Care (as he did).  But the Court
need not reach that question for present purposes, because, even
without such knowledge, Rosen fully agreed to what he clearly knew
was a solicitation of a bribe, i.e., an offer of Kruger's official
assistance in exchange for Rosen's promise that he would "get [the
Compassionate Care contract] done."  See Gov. Ex. 3301.

34

With this understanding in mind, Rosen, between April and September, 2008, approached Flanz several times about the contract, insisting that "he was getting a lot of pressure from Senator Carl Kruger" and so "needed to get the contract completed." Tr. at 969-70. However, despite Rosen's continuing persistence, Flanz repeatedly refused to sign-off on the contract. See id. Rosen, for his part, remained either unwilling or unable to secure the contract for Compassionate Care without the concurrence of Flanz and Johnson. See id. On September 5, 2008, however, after months of wrangling, Rosen decided to bring the matter to a head. As Flanz was leaving work for the weekend, Rosen once again expressed that he "needed that Compassionate Care contract" and therefore directed Flanz "to bring it in so [he] could sign it and give it to Kruger" the following week. Id. at 976. However, the following week, Seminerio was arrested in connection with the allegations made in the Indictment, and Rosen decided to sever his relationship with Kruger and discontinue his efforts to execute the SSI-Compassionate Care contract, see id., an act itself reflecting his consciousness of guilt.

On the basis of the foregoing facts, certain conclusions of law directly follow. Each of the remaining charges against Rosen "criminalizes . . . a quid pro quo agreement -- to wit, a government official's receipt of a benefit in exchange for an act he has

35

performed, or promised to perform, in the exercise of his official

authority." United States v. Ganim, 510 F.3d 134, 141 (2d Cir. 2007)

(Sotomayor, J.).  In proving the existence of a quid pro quo

agreement, the Government need not prove that any "specific act to be

performed [by the government official] was identified at the time of

the [bribe]" nor must it "link each specific benefit to a

[corresponding] official act." Ganim, 510 F.3d at 146.  It is enough

that the Government proves that "a particular payment [or promise to

provide something of value] is made in exchange for a *commitment* to

perform official acts to benefit the payor in the future."  Id. at

147 (emphasis in original).  "To require otherwise could subvert the

ends of justice in [situations]" -- such as is alleged in the

Indictment -- "involving ongoing schemes," which "do not always spell

out in advance the specific match between gift and act."  Id. at 148;

see also id. (the intended exchange can be "'this for these' or

'these for these,' not just 'this for that.'").  Accordingly, the

statutes underlying the remaining charges against Rosen encompass

"scheme[s] involving payments [or promises to pay] at regular

intervals in exchange for specific official acts as the opportunities

to commit those acts arise," even if "the opportunity to undertake

the requested act has not [yet] arisen."  Id. ("fulfillment of the

quid pro quo is not an element of the offense").

36

The Court concludes that, with respect to each of Rosen's relationships with Seminerio, Boyland, Jr. and Kruger, the quid pro quo requirement has been satisfied and the evidence has shown, beyond any reasonable dispute, that Rosen conferred benefits, or sought to confer benefits, on Seminerio, Boyland, Jr., and Kruger in return for acts to be taken in their official capacities.

As to Seminerio and Boyland, Jr., the benefits took the form of regular payments from MediSys funds, totaling $410,000 and $175,000, respectively, that Rosen attempted to cloak as compensation for their virtually non-existent "consulting" services. As to Kruger, the benefit took the form of directing MediSys to award a lucrative vendor contract to Compassionate Care, a contract in which Rosen understood Kruger to have a strong personal interest (even if he did not necessarily know of Kruger's financial interest).

In direct return for these benefits, Seminerio, Boyland, Jr., and Kruger all took official acts to benefit MediSys, often at Rosen's express direction or request. The official acts so taken have already been detailed at length above, but they largely centered on the two issues that Rosen cared about most, and with respect to which State legislators could arguably be of the most assistance: New York State's financial support for MediSys, and the State's facilitation of MediSys' continued expansion and growth.

37

Each of these arrangements, moreover, involved a corrupt agreement or conspiracy between Rosen and, respectively, Seminerio, Boyland, Jr., and Kruger, into which Rosen entered knowingly, willfully, and with a specific intent to bribe the legislators and thereby deprive their constituents of their honest services.  Again, the evidentiary support for this conclusion has already been detailed above, but it comes down, in each instance, to a corrupt agreement between a willing briber and a willing bribee.

Given these overall findings -- all made beyond a reasonable doubt -- the only element still in issue as to Counts 5 and 6, which charge mail and wire fraud, respectively, and Count 8, which charges conspiracy, is whether Rosen caused the use of the mails or interstate wires in execution of his various bribery schemes.  That this is true has repeatedly been evidenced beyond a reasonable doubt by extensive evidence in this case.  For instance, Rosen sent the Vendex and VQR forms to the City and the State, as well as MediSys' checks to Seminerio and Boyland, Jr, through the mails.  See Gov. Exs. 54, 1115.  Similarly, Seminerio, Boyland, Jr., and Kruger each sent letters through the mails, in which they advocated to various power brokers on behalf of MediSys, in furtherance of their respective schemes with Rosen.  See, e.g., Gov. Exs. 1248, 2303; cf. Gov. Ex. 3208.  As far as wires, most if not all of Rosen's e-mails

to Seminerio, Boyland, Jr., and Kruger were wired through interstate facilities.  See Tr. 722-730.

Turning to Counts 7 and 9, which charge Rosen with conspiring with Seminerio and Boyland, Jr., respectively, to commit federal programs bribery and Travel Act conspiracy, the Court's findings detailed above establish beyond a reasonable doubt that Rosen intentionally conspired with, respectively, Seminerio (Count 7) and Boyland, Jr. (Count 9) to offer each of them bribes worth more than $5,000 to influence each of them in connection with their official duties and also to violate New York State's anti-bribery laws. Likewise, as to both counts, the foregoing findings prove beyond a reasonable doubt the use of mails and interstate facilities in furtherance of each conspiracy, as well as New York State's receipt during each of the years in issue of more than $10,000 under a federal program.

Finally, as to venue, it is clear that acts constituting each of the charged crimes occurred within the Southern District of New York. Each of the Vendex and VQR forms signed by Rosen were sent to the City Mayor's Office in Manhattan.  Rosen's meeting with Governor Pataki's Chief of Staff, John Cahill, which was arranged by Seminerio in return for part of his bribes, occurred in Manhattan, as did Kruger's similarly bribe-induced meeting with Governor Patterson. See Tr. at 242, Gov. Ex. 3225.  More broadly, throughout the entirety

39

of the relevant time periods, Rosen was living in Westchester County and regularly traveling in and through the Southern District in the ordinary course of his work at MediSys.  Tr. 903, 938-941.  Given the dominant role that these corrupt relationships came to play in his work in the period between 2003 and 2008, it is fair to say that in coming to work, he was also coming to bribe.

For all the foregoing reasons, the Court concludes that Rosen is guilty, beyond a reasonable doubt, of the crimes charged in Counts 5, 6, 7, 8, and 9 in the Indictment.  Counsel are directed to jointly call Chambers to schedule a date for sentencing on these charges.

SO ORDERED.

Dated: New York, NY
      September 12, 2011                   JED S. RAKOFF, U.S.D.J.