**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA,

                          - v. -

DAVID ROSEN,

                          Defendant.

No. S1 11-cr-0300 (JSR)

**SENTENCING MEMORANDUM SUBMITTED ON BEHALF OF DAVID ROSEN**

MORVILLO, ABRAMOWITZ, GRAND,
 IASON, ANELLO & BOHRER, P.C.
*Attorneys for Defendant David P. Rosen*
565 Fifth Avenue
New York, New York 10017
(212) 856-9600

**REDACTED VERSION**
**FILED VIA ECF**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

I.     PRELIMINARY STATEMENT ............................................................................ 1

II.    THE PRESENT CASE CAN AND SHOULD BE  DISTINGUISHED
       FROM TYPICAL BRIBERY CASES............................................................... 4

   A.   The Seminerio/Jamaica Hospital Relationship ................................. 4

   B.   The Boyland, Jr./Brookdale Hospital Relationship ........................ 7

   C.   The Kruger/Brookdale Relationship ................................................ 9

   D.   None of the Transactions Were Initiated by Mr. Rosen ................ 10

   E.   Typical Bribery Cases...................................................................... 11

III.   THE GUIDELINES SHOULD NOT APPLY BECAUSE THE FACTS AND
       CIRCUMSTANCES OF THE PRESENT CASE FALL WELL OUTSIDE THE
       HEARTLAND OF CASES................................................................................ 13

III.   DAVID ROSEN'S PERSONAL HISTORY ................................................. 18

IV.    DAVID ROSEN'S WORK HISTORY ......................................................... 22

   A.   The Rebuilding and Expansion of Jamaica Hospital ..................... 22

   B.   MediSys's Expansion to Flushing Hospital.................................... 31

   C.   MediSys's Expansion to Brookdale Hospital ................................. 34

   D.   David's Role and Leadership at the Hospitals................................ 36

   E.      David's Leadership Role in the Health Care Industry ................. 42

V.     FACTORS FOR SENTENCING...................................................................... 47

   A.   David Rosen's History and Characteristics .................................... 48

   B.   The Nature and Circumstances of the Offense ............................... 50

   C.   A Period of Incarcerations is Not Necessary to Achieve
        Either General or Specific Deterrence ........................................... 51

VI.    SENTENCING RECOMMENDATION AND COMMUNITY SERVICE PLAN ......... 52

VII.   CONCLUSION................................................................................................. 54

# <u>TABLE OF AUTHORITIES</u>

## <u>Cases</u>

<u>Simon v. United States</u>, 361 F. Supp. 2d 35 (S.D.N.Y. 2005)) .................................................. 14

<u>United States v. Adelson</u>, 441 F. Supp. 2d 506 (S.D.N.Y. 2006) (JSR)...................................... 18

<u>United States v. Alfonzo-Reyes</u>, 384 F. Supp. 2d 523 (D. Puerto Rico 2005)............................ 12

<u>United States v. Cavera</u>, 550 F.3d 180 (2d Cir. 2008) (en banc).............................................. 14

<u>United States v. Crosby</u>, 397 F.3d 103 (2d Cir. 2005).............................................................. 14

<u>United States v. DeLaurentis</u>, 230 F.3d 659 (3d Cir. 2000) ..................................................... 12

<u>United States v. Gaind</u>, 829 F. Supp. 669 (S.D.N.Y. 1993) ............................................... 51, 52

<u>United States v. Gamez</u>, 1 F. Supp. 2d 176 (E.D.N.Y. 1998)...................................................... 48

<u>United States v. Ganim</u>, 510 F.3d 134 (2d Cir. 2007) .............................................................. 11

<u>United States v. Heffler</u>, 462 F.2d 924 (3d Cir. 1968)............................................................... 12

<u>United States v. Hirsch</u>, 239 F.3d 221 (2d Cir. 2001) ............................................................... 16

<u>United States v. Jolly</u>, 102 F.3d 46 (2d Cir. 1996) ................................................................... 16

<u>United States v. Jones</u>, 531 F.3d 163 (2d Cir. 2008) ..........................................................13-14

<u>United States v. Ministro-Tapia</u>, 470 F.3d 137 (2d Cir. 2006).................................................. 47

<u>United States v. Nuzzo</u>, 385 F.3d 109 (2d Cir. 2004)................................................................ 16

<u>United States v. Redzik</u>, 627 F.3d 683 (8th Cir. 2010)............................................................... 12

<u>United States v. Regensberg</u>, 08 Cr. 219, 2009 WL 2163461
    (S.D.N.Y. June 29, 2009)......................................................................................... 16

<u>United States v. Ricketts</u>, 651 F. Supp. 789 (S.D.N.Y. 1987) ................................................... 12

<u>United States v. Soumano</u>, 318 F.3d 135 (2d Cir. 2003) .......................................................... 12

<u>United States v. Stewart</u>, 590 F.3d 93 (2d Cir. 2009)............................................................... 52

<u>United States v. Thorn</u>, 446 F.3d 378 (2d Cir. 2006) ............................................................... 17

<u>United States v. Wechsler</u>, 408 F.2d 1184 (4th Cir. 1969)........................................................ 12

**Statutes**

U.S.C. § 3553(a) ........................................................................................................ 47

U.S.C. § 3553(a)(1).................................................................................................... 50

U.S.C. § 3553(a)(2)(A). .............................................................................................. 50

**United States Sentencing Guidelines**

U.S.S.G. § 2B1.1 Application Note 19(C)................................................................... 18

U.S.S.G. § 3B1.3 Application Note 1 .......................................................................... 16

U.S.S.G. § 3B1.3 Application Note 5 .......................................................................... 16

We respectfully submit this memorandum and the accompanying letters on behalf of David Rosen for the Court's consideration in connection with his sentencing scheduled for January 6, 2012.

## I.      PRELIMINARY STATEMENT

Fashioning a just sentence for David Rosen, we submit, calls for consideration and a blending of various facts about Mr. Rosen, his career, his character, his significant contributions to healthcare for the disadvantaged, the amount of time and effort in which he engaged to master the intricacies of healthcare management and policy, his leadership, the political aspect of healthcare funding at the New York State legislative level, the ethical torpor in Albany, his conduct herein, the harm done to the public by that conduct, the impact of this case upon Mr. Rosen and his family, and any community to be deterred.

More so than most cases, these factors, when examined individually or as a group, do not snugly fit expectations of an individual involved in corruption.  This is not a case involving the greed of an overly ambitious man.  This is not a case in which the requested official acts were base or pointedly against the public interest.  To the contrary, this is a case involving a dedicated health system and hospital administrator, and the benefits sought were, in large part, unfunded monetary requests that would have improved the quality of care provided to the indigent communities served by the deteriorating hospitals in South Queens and Brooklyn.  The other benefits sought were access to the political process involving budgetary and Medicaid distributions.  These matters were important aspects of operating sophisticated health care entities; and the safety net hospitals of the City were no match for larger academically oriented and well connected urban hospitals or the politically powerful hospitals spread out in other parts of the state.  They needed a voice to assist their survival.

Unfortunately, the political process does not often act on behalf of the needy without prodding.  For the rich and powerful, the prodding comes naturally because of a thicket of legislative practices that encourage political favors stacked against each other.  Under the mores and culture of Albany, state legislators were free to exchange political support for campaign contributions from successful board members and physicians.  These contributions were not available from supporters of safety net hospitals.  Moreover, legislators often worked for organizations that were profit oriented while receiving compensation and maintaining their freedom to vote in a way which furthered the interests of those institutions.  Thus, the system frequently favored the rich over the poor and ignored the needs of the safety net providers.

In this atmosphere, David Rosen's achievements in surviving, growing and reconstructing his healthcare network are simply remarkable, and in large part attributable to his character and his dogged efforts not to compromise on the issues of access and quality of care – regardless of a patient's ability to pay.  Indeed, even in light of the Court's findings in this case, those who know and have worked with David over the last four decades still hold him in high esteem, as they have made known to the Court in a salvo of thoughtful and poignant letters.

Perhaps the circumstance that best explains the discrepancy between the Court's findings and the public view of David Rosen is the continuity of his relationship with the legislators before and after the contracts in question in this case.  David learned early in his career of hospital administration that the support of Albany for any hospital endeavor was essential and rarely forthcoming without some lobbying and political effort.  As a result, he and his management team attempted to develop relationships with New York State legislators and officials inside the Governor's office. They visited Albany several times a year to educate the legislators as to the special needs of the impoverished communities the hospitals served.  They

met and conversed with a wide variety of lawmakers, from the party leaders, to the heads of the healthcare committees, down to freshman legislators.  No one denied that this was their right and such activity was well within the bounds of propriety and the First Amendment.

This activity began in the 1970's and continued steadfastly through the inception of the contracts at issue.  Throughout this period, David freely communicated with both Anthony Seminerio and William F. Boyland, Sr. about State services and the needs of the hospitals.

Nothing changed after the consummation of the contracts. The dialogue never veered. The conduct of the participants was unchanged.  The conversations were never altered in substance or frequency.  The management team continued to bring its message to Albany several times a year.  Of course, David well understood that all of these activities played out in the context of political party politics and conflicting agendas.  Thus, anyone scrutinizing David's conduct before or after the contracts were executed would be hard pressed to denote any shift in his actions or the official dialogue.  David Rosen poured his heart and soul into protecting his and similarly situated hospitals in the political process.  He became a respected spokesman of the safety net hospitals through his roles at the hospital associations and other organizations, such as the Coalition of Safety Net Hospitals and the Primary Care Development Corporation.  Those who have written to the Court have observed and properly lauded David for his efforts.

We believe that this contention is important to the Court's evaluation of David Rosen. The remaining core of facts attests to the strength and breadth of David's character and conduct. His leadership, the reconstruction of the hospitals, and his devotion to raising the quality and equality of healthcare are starkly portrayed in the letters addressed to the Court.  We will, in the remaining portions of this memorandum, attempt to educate the Court as to why these traits demonstrate that a non-incarcerative sentence is appropriate.

## II.   THE PRESENT CASE CAN AND SHOULD BE DISTINGUISHED FROM TYPICAL BRIBERY CASES

The facts and circumstances of this case, as found by the Court in the Findings of Fact and Conclusions of Law, dated September 12, 2011 (the "FFCL"), differ dramatically from those of a typical bribery case.  Bribery is ordinarily a crime of greed.  The typical bribery case involves the briber initiating an improper relationship, seeking personal benefits, and causing harm to the public good.  As discussed in detail below, this case includes none of these elements.

David Rosen did not seek to benefit personally in any way from the three relationships involved in the present case.  Any benefits that may have resulted from the official actions taken by the elected officials would have flowed to not-for-profit healthcare organizations and the largely indigent communities they served.  Nor did any of the official actions cause public harm.  As a preliminary matter, the official actions at issue here were minimal and virtually all of them were unsuccessful.  However, even had they been successful, they would not have been detrimental to the public good.  Indeed, many of the actions likely would have resulted in a benefit to the constituencies served by the MediSys hospitals.  Finally, in each relationship, David was not the initiator; rather, the elected official pursued David to seek the arrangement.

While the Court determined that David agreed to pay Messrs. Seminerio and Boyland, Jr. and award a contract to a hospice company favored by Mr. Kruger in order to receive official state level assistance from these elected officials, a review of each of the relationships and the official actions sought clearly demonstrates the distinctions between this case and a typical bribery case:

### A.   The Seminerio/Jamaica Hospital Relationship

The contract between Seminerio and Jamaica Hospital Medical Center ("JHMC" or "Jamaica Hospital") was executed in April 1999, after a two decade long relationship during

which Seminerio continuously looked out for the hospital.  The Court found five specific instances in which official action was sought from Seminerio.  See FFCL at 15-18.

*First*, Seminerio's assistance was sought in 2006 in connection with arranging a meeting between David and John Cahill, the then Chief of Staff to the governor.  The meeting related to the forgiveness of a debt incurred by Brookdale University Hospital and Medical Center ("Brookdale") prior to MediSys's takeover.  Seminerio's assistance consisted of having members of his staff contact Mr. Cahill's staff to set up the meeting.  The debt was never discharged.

This official action by Seminerio clearly was not intended to personally benefit David. The discharge of the debt would have benefitted Brookdale, a not-for-profit healthcare institution, and the communities served by the hospital.  For the same reasons, there can be no argument that there was public harm as a result of Seminerio's official action.  The debt was never discharged; but even if it had been, the public – namely, the patients and employees of Brookdale – would have benefitted.

*Second*, Seminerio acted as one of a half dozen co-sponsors of a bill in 2006 that would have provided for the refinancing of JHMC's mortgage, which potentially would have enabled JHMC to enter the bidding for two failing Queens hospitals, Mary Immaculate Hospital ("MIH") and St. John's Hospital ("St. John's").  Ultimately, the legislation did not pass and both MIH and St. John's closed, reducing access to healthcare for the Queens community.

Seminerio's co-sponsorship of the bill was not intended to benefit David personally.  The beneficiaries of such legislation would have been JHMC, its constituent communities, and potentially the employees and patients of MIH and St. John's (had JHMC bid and won).  Nor would there have been any public harm caused by the passage of the legislation.  Indeed, the ultimate closure of MIH and St. John's reduced availability of health care in their communities

and resulted in severe overcrowding at JHMC's emergency department, which was a substantial and demonstrable detriment to the people of South Queens.

*Third*, Seminerio requested that MediSys be considered for a Managed Long Term Care designation. The designation would have enabled MediSys to provide comprehensive acute long term care services for the large populations of low-income aging and/or disabled residents in Queens and Brooklyn. MediSys would have been able to expand the services offered to these patients; providing more coordinated care, in a cost effective manner. Thus, here again, David Rosen would have received no personal benefit from such a designation, and the public would have benefitted from it – not been harmed by it. Indeed, the uncontroverted public benefit of Managed Long Term Care is best demonstrated by the fact that beginning in April 2012, it will be mandatory for all Medicaid enrollees, as ordered by DOH.

*Fourth*, Seminerio "assisted MediSys'[s] interests" with respect to the State budget (FFCL at 17) by communicating with David and other legislators about proposed Medicaid cuts. As a preliminary matter, the State budget affects every hospital in the State – not just MediSys. Because of the importance of the State budget to all hospitals, the hospital trade associations, the Healthcare Association of New York Sate ("HANYS"), and the Greater New York Hospital Association ("GNYHA"), are the primary lobbyists for this issue. Indeed, the information Seminerio relayed to David in the August 12, 2008 phone call relied on by the Court (see FFCL at 17), had already been disseminated by HANYS and GNYHA, and was publicly available through a number of media sources, including the New York Times. See, e.g., Def. Exh. D-6034.

Moreover, any conversations between Seminerio and either David or other legislators, would have benefitted the general public – not David Rosen – by avoiding ill afforded further

cuts to Medicaid.  Those conversations resulted in no harm to the public interest.  As the Court

stated during the Rule 29 arguments: "[W]hen it comes to Medicaid, where it's so self-evident

that a poor community is going to be vitally and detrimentally affected by Medicaid cuts, what

assemblyman who either had any sense of his own constituent[s'] welfare or, even short of that,

wanted to be reelected, would do anything other than fight like hell to prevent the Medicaid

cuts."  Tr. at 1580:15-20.

*Finally*, Seminerio called Dennis Whelan, an executive at the New York State

Department of Health, on July 10, 2008, and during that call (the majority of which dealt with

other subject matters) recommended that MediSys be permitted to acquire MIH.  Here, as with

Seminerio's co-sponsorship of the bill in 2006, the potential beneficiaries of this conversation

were the employees and patients of JHMC and MIH – not David.  Similarly, Seminerio's

conversation with Mr. Whelan resulted in no harm to the public at large.  Indeed, as Mr. Whelan

testified, it made sense "from a public policy point of view" for JHMC to take over MIH as

"[b]oth institutions served the same area of patients, were more familiar with the populations

there . . . [and JHMC could] rationalize [services] across those two campuses."  Tr. at 301:18-

302:6.  Ultimately, no hospital was permitted to take over MIH and St. John's and the hospitals

were closed without any transition planning, resulting in JHMC's emergency department and

operating rooms being inundated with patients.

### B.     The Boyland, Jr./Brookdale Hospital Relationship

William Boyland, Jr. was employed by an affiliate of Brookdale Hospital from 1994, well

before MediSys became Brookdale's sponsor.  Several months after Boyland, Jr. was elected to

the Assembly in February 2003, he requested that his $35,000 per year job be converted into a

consultancy.  The Court determined that from 2003 through 2008, Boyland, Jr. provided official

assistance to MediSys on four occasions.  See FFCL at 27-28.  Specifically: (1)  a February 26, 2004 letter from Boyland, Jr. to Assembly Speaker Sheldon Silver requesting a $3 million grant for Brookdale Hospital; (2) a February 28, 2007 letter from Boyland, Jr. to Silver seeking a $3 million grant for JHMC; (3)  Boyland, Jr.'s expressed intention to meet with certain health officials regarding the accelerating failure of MIH; and (4) setting up a meeting in 2006 between David, Boyland, Jr., and other elected officials to discuss the state budget.

As with the Seminerio relationship, there is no evidence that David Rosen did or would have benefited personally from any of these official actions.  If either of the grants that Boyland, Jr. sought for Brookdale or JHMC had been received, they would have been used to improve the delivery of healthcare to the communities served by the hospitals.  Thus, the beneficiaries would have been the residents of Queens and Brooklyn.  Similarly, any meeting that Boyland, Jr. may have had with New York State officials related to the MIH situation would only have benefited the people served by the hospitals.  The closing of Mary Immaculate left Queens with the "smallest bed-to patient ratio in [New York City]."  Scharr, Jillian, Queens Hospitals Overcrowded in Wake of Recent Closings, *available at* www.nbcnewyork.com/news/local/Queens-Hspitals-Overcrowded-in-Wake-of-Recent-Closings-94761814.html (last visited Dec. 22, 2011).

And, finally, as discussed above, discussions about the New York State budget affected all hospitals, not just the MediSys hospitals, and certainly not David Rosen personally.  Again, as the Court opined during the Rule 29 motion: "I think we have to make distinctions, but it seems to me that if Mr. Rosen was paying $175,000 to get Mr. Boyland or any other assemblyman from that district to vote against Medicaid cuts, he was wasting the hospital's money, because you can get that for free, guaranteed."  Tr. at 1581:6-10.

Nor would any of Boyland, Jr.'s official actions have harmed the public.  Boyland Jr.'s requests for funding for Brookdale and JHMC were designed to promote the welfare of these safety net hospitals.  The Court is well aware of the financial plight of both of these institutions by virtue of the indigent and uninsured populations, many of whom are immigrants, that are served by the hospitals.  Had either of Boyland, Jr.'s requests been granted, in whole or part, much needed equipment, construction, or personnel would have been added to the hospitals, to the benefit of the patients.

Similarly, any discussions with New York State officials by Boyland, Jr. related to the closure of MIH also only would have benefited the patients of the hospitals.

### C.    The Kruger/Brookdale Relationship

The Court identified two benefits derived from Kruger's official state action: (1) an award of state grants to JHMC and Brookdale; and (2) a meeting between Kruger and Governor Paterson at which it was expected that Kruger would present arguments as to why the state should embrace the idea that several Queens hospitals should merge.  See FFCL at 32-33.

Here again, there was no evidence of any personal benefit bestowed upon David Rosen.  The grants to JHMC and Brookdale were to be used to acquire new medical equipment – a digital mammography unit for Brookdale and two modules for pediatric echocardiography and electrophysiology at JHMC – that would benefit the patients, not David.  Notably, the funds requested by Kruger were never received by the hospitals and, thus, the medical equipment was not acquired.  Similarly, the residents of Queens would have been the beneficiaries of the Kruger's presentation of a merger plan for the Queens Hospitals, as the plan was designed to prevent or mitigate the closing of three hospitals in Queens. Kruger's actions would have helped

the patients of Brookdale and JHMC, and benefited the communities served by several of the then operating hospitals in Queens; thus, helping the public's interest, not harming it.

### D.    None of the Transactions Were Initiated by Mr. Rosen

The Court is well aware of the dependence not-for-profit hospitals have on the State legislature and State agencies.  This fact placed David in a position that made him extremely susceptible to the requests made by Seminerio, Boyland, Jr., and Kruger.  In each situation, the evidence presented to the Court demonstrates that it was not David who went looking for these arrangements; but, rather, David reacting to specific requests from the elected officials.

With respect to the contract between Seminerio and JHMC, the testimony and evidence presented indicate that either George Kalkines or Seminerio brought up the concept of a consulting arrangement.  David was then faced with the problem of what he should do in light of the significant local and state assistance Seminerio had historically provided to JHMC.

The Boyland, Jr. consulting arrangement was even more difficult.  Boyland, Jr. worked for Brookdale for almost 10 years (well before MediSys took over the hospital) before he was elected to the Assembly.  After his election, Boyland, Jr. approached David about converting his employment to a consultancy given the new demands on his time.  David agreed.  The alternative was to reject Boyland, Jr.'s request and fire a newly elected assemblyman who represented large portions of Brookdale's employees and patients.  Moreover, as the Court heard during the trial, the Boyland family had historically been very supportive of Brookdale.  Firing Boyland, Jr. after almost 10 years of employment would have risked losing their sponsorship, which was vital to the hospital in Brownsville.

Similarly, the evidence makes clear that it was Kruger who sought some type of arrangement with David, not vice-versa.  It was Kruger, without solicitation by David, who

attempted to award a total of $425,000 to Brookdale and JHMC in 2007 (none of the money was ever received); it was Kruger who unsuccessfully sought David's approval of certain malpractice insurance; and it was Kruger who raised and reminded David of the subject of the Compassionate Care hospice contract.

In each of these cases, David did not set out to engage in wrongdoing.  He responded to requests made by people that had the power to damage or impede the institutions he spent a lifetime rebuilding and improving.

### E.  <u>Typical Bribery Cases</u>

When viewed in the context of a number of reported bribery cases, the facts and circumstances of this case, as discussed above, demonstrate that this is not the typical bribery case.  In the overwhelming number of bribery cases prosecuted, the briber sought to obtain a personal benefit flowing either directly to him or to a "for-profit" company in which the briber had an economic interest.  Moreover, these same cases demonstrate that typically the bribee was asked to and did perform some act that proved detrimental to the public interest.

<u>United States v. Ganim</u>, 510 F.3d 134 (2d Cir. 2007), which was much discussed at the trial of this case, is illustrative of the differences between the present case and the typical bribery case.  In <u>Ganim</u>, the evidence showed that Ganim, the mayor of Bridgeport, Connecticut, was entertained, provided meals, clothing, fitness equipment, wine, jewelry, and cash by the bribers.  In exchange, the bribers had lucrative contracts steered to their clients by the Mayor and were, in turn, paid lavish consulting fees by these clients.  In one such instance, the sum of $495,000 was shared by the bribers and Ganim, the bribee.  Thus, the bribers received substantial personal benefits from their bribes.

When the conspirators had a falling out, the clients of the ex-briber were prevented from obtaining contracts with the City of Bridgeport and the City was severely damaged by the scheme: unfit contractors received City assignments, the City's pension plan was placed at risk, legitimate contractors were prevented from obtaining City assignments and the construction of a new juvenile detention center had to be aborted.

Further examination of the federal case law related to bribery statutes (18 US.C. §§ 201, 666, 1346, and 1952) demonstrates that in the typical bribery case, in addition to diminishing the public's respect for government, there is a specific identifiable public harm – which is utterly lacking in the present case.  The cases are legion in which bribes are paid to avoid legitimate taxes, obtain sweetheart contracts, prevent competitive bidding processes, receive licenses or official documents, which the briber neither earned nor was eligible for, receive loans, and/or ignore violations, whether from the police, regulatory agencies, or the judiciary.  In these cases, public funding, public processes, or public safety are sacrificed or jeopardized.  See, e.g., United States v. Soumano, 318 F.3d 135 (2d Cir. 2003) (social security cards); United States v. Alfonzo-Reyes, 384 F. Supp. 2d 523 (D. Puerto Rico 2005) (loans); United States v. Heffler, 462 F.2d 924 (3d Cir. 1968) (contracts); United States v. DeLaurentis, 230 F.3d 659 (3d Cir. 2000) (avoid regulations); United States v. Redzik, 627 F.3d 683 (8th Cir. 2010) (drivers licenses); United States v. Wechsler, 408 F.2d 1184 (4th Cir. 1969) (zoning); United States v. Ricketts, 651 F. Supp. 789 (S.D.N.Y. 1987) (conceal violation).

The present case falls far outside this pattern.  David never requested, nor received any personal benefit.  Indeed, even the not-for-profit entities, MediSys, JHMC, and Brookdale, received no benefit.  Thus, the public was not harmed by either being deprived of a benefit or having its safety endangered in any way.  (Ironically, public safety would have been advanced if

any of the requests had been granted).  Of course, misconduct by public officials diminishes the public trust and confidence in government and cannot be countenanced.

We respectfully submit that while David's actions may be deemed by the Court to be inappropriate, his motivations were good.  While his conduct may be attacked, David's motivation in all three instances was to attempt to better the status of organizations that provided vital health and community services in federally designated underserved areas to a largely indigent population.  Not one of his acts sought to enhance his wealth or his position.[1] At all times, he attempted to assure that these safety net hospitals received the funding necessary to their survival and necessary to ensure the delivery of quality healthcare.

## III. THE GUIDELINES SHOULD NOT APPLY BECAUSE THE FACTS AND CIRCUMSTANCES OF THE PRESENT CASE FALL WELL OUTSIDE THE HEARTLAND OF CASES

The differences between this case and typical bribery cases demonstrate that the present case falls well outside the heartland of cases for which the United States Sentencing Guidelines ("U.S.S.G.") was intended.  Thus, in fashioning the appropriate sentence for David Rosen, the Court should reject a Guidelines sentence and make an "'individualized assessment' of the sentence warranted by § 3553(a) 'based on the facts presented.'" United States v. Jones, 531

---

[1] The government suggested in summation that David was motivated in part by his compensation.  "So David Rosen was getting rich as MediSys ministered to the poor" (Tr. 1707).  The resounding proof belies this assertion.  Exhibit D-1403 (at page 23) indicates that David Rosen, with the longest tenure in the industry, was only in the 48th percentile of N.Y.S. hospital CEOs, in terms of compensation.  Of course, year after year, outside compensation experts, who also advised the vast majority of hospitals in the region, determined the compensation to be fair and reasonable.  As a number of the letters to the Court point out, David had multiple opportunities to leave MediSys and earn more money.  See, e.g., Exh. 1, Letter from Ole Pedersen (David "could have easily moved on to [a] calmer and far more prestigious post and left us all behind as most of his colleagues would have done.").  He chose not to.  See Exh. 2, Letter from Robert H. Smith, M.D., an interventional radiologist physician at JHMC, (describing a conversation in which David "spoke of his own experience, the temptation of other job offers, the dreams of greener pastures.  But for him, his commitment was to Jamaica Hospital and the team he built there").  Moreover, from 2004 to 2011 David by contract was entitled to a minimum of 3% salary raises annually, which he did not implement for a number of those years.  The government's snide assertion is plainly wrong.

F.3d 163, 170 (2d Cir. 2008) (citations omitted); see also United States v. Cavera, 550 F.3d 180, 188-89 (2d Cir. 2008) (en banc); United States v. Crosby, 397 F.3d 103, 113 (2d Cir. 2005).

We understand that the Court must consider the Guidelines, and only after determining the Guidelines recommendation should the Court consider the other factors in Section 3553(a), and decide whether "to impose … a sentence within the applicable Guidelines range or with permissible departure authority," or to "impose a non-Guidelines sentence." Crosby, 397 F.3d at 113. In conducting this analysis, "[a] district court may not presume that a Guidelines sentence is reasonable; it must instead conduct its own independent review of the sentencing factors, aided by the arguments of the prosecution and defense." Cavera, 550 F.3d at 189 (footnote omitted). Accordingly, even though the consideration of the applicable Guidelines range is entitled to only the same weight as each other factor enumerated in Section 3553(a) (see Simon v. United States, 361 F. Supp. 2d 35, 40 (S.D.N.Y. 2005)), we begin our sentencing analysis by discussing the Sentencing Guidelines range as calculated in the Presentence Investigation Report (the "PSR").[2]

The PSR concludes that David's guidelines range is 188 to 235 months based on a Total Offense Level of 36. See PSR at ¶¶ 62, 95. The PSR's calculation includes a sixteen level enhancement for the "value of the payments" made to Seminerio and Boyland, Jr., and the "value of the benefit" that would have been received from Kruger, and an additional two level enhancement for abuse of position of trust. See PSR at ¶¶53, 56. We believe that the appropriate Total Offense Level is no greater than 32 because, as described below, the amount attributable to Mr. Rosen should be at most $585,000 – not $1,055,000, and there should be no enhancement for abuse of trust.

---

[2] References to the PSR refer to the initial PSR sent to us by Probation on November 16, 2011. The final PSR has not yet been disseminated and thus, the arguments related to Probation's Guidelines calculation may be moot, if Probation alters the final PSR based on our previously submitted objections.

Paragraph 53 of the PSR provides for a sixteen level enhancement pursuant to Sections 2C1.1(b)(2) and 2B1.1(b)(1)(I) of the U.S.S.G. based on the: (1) $410,000 paid to Seminerio; (2) $175,000 paid to Boyland, Jr.; and (3) the $470,000 in funding requested by Kruger – resulting in a total of $1,055,000. PSR at ¶53. The amount attributable to the Kruger relationship should be $0. The evidence presented at trial established that Kruger requested funding for Brookdale and Jamaica at some point prior to November 2007.[3]  See Gov't Ex. 3200 (November 7, 2007 letter from Kruger to Rosen informing Rosen that he had secured $325,000 for Brookdale and had requested funding for Jamaica also). This funding was awarded by Kruger without any request from David. Moreover, Kruger made the funding requests at least five months before David got involved at all in the Hospice Care Company issue. Compare Gov't Ex. 3200 with Gov't Ex. 3302 (The letter in which Kruger informed David of the funding for Brookdale is dated November 7, 2007, and the first email David sent regarding the Hospice Care Company contract is March 27, 2008). Thus, the funding requested by Kruger was not part of any alleged scheme between David and Kruger. Moreover, although the funding requests were made by Kruger there was no evidence presented at trial that either Brookdale or JHMC ever received the funding. Indeed, as confirmed by the attorney representing the hospitals, neither Brookdale nor JHMC has received any of the funds requested by Kruger. Accordingly, the offense level should be increased by only 14, reflecting a total of $585,000.[4]

---

[3] This was during the period of time that Kruger was trying to persuade David to accept an alternative form of malpractice insurance for Brookdale's physicians offered by a broker whom Kruger recommended – a concept rejected by David.

[4] Even this amount overstates the value of what was received by Seminerio and Boyland, Jr. Both Seminerio and Boyland, Jr. were paid on the books of the hospitals and paid taxes on the amounts they received.

Paragraph 56 of the PSR applies a two level enhancement under U.S.S.G. § 3B1.3 for abuse of trust based on the fact that David was the CEO of MediSys who "held discretionary and decision-making authority for MediSys."  PSR at ¶56.  The application of § 3B1.2 is not warranted in this case.  The Second Circuit has held that applying this sentencing enhancement is appropriate only if the court determines that: (1) the defendant occupied a position of trust, as viewed from the perspective of the victim; and (2) the defendant violated that trust in a way that significantly contributed to the crime at issue.  See United States v. Nuzzo, 385 F.3d 109, 115 (2d Cir. 2004).  Here, neither prong of this analysis is satisfied.

The Second Circuit has repeatedly held that to satisfy the first prong of this test "the defendant's position must involve discretionary authority . . . [and that] *this discretion must have been entrusted to the defendant by the victim*."  United States v. Hirsch, 239 F.3d 221, 227 (2d Cir. 2001) (emphasis added); United States v. Jolly, 102 F.3d 46, 48 (2d Cir. 1996) ("Limiting an enhancement for abuse of trust to the misuse of *discretionary authority* entrusted by the victim or on the victim's behalf is consistent with the examples given in the Commentary."); see also United States v. Regensberg, 08 Cr. 219, 2009 WL 2163461, at * 6 (S.D.N.Y. June 29, 2009) (rejecting application of Section 3B1.3 where defendant was not afforded discretionary authority by the victim).  This enhancement more typically applies in cases where, for example, an attorney acting as trustee of a trust is given discretion in overseeing the trust, or when a licensed broker is acting with discretion to manage a securities account.  See U.S.S.G. § 3B1.3, Application Notes 1, 5.  In the present case, the "victims" of the conduct at issue are "the citizens of New York State, who were deprived of the honest services of the elected officials...."  PSR at ¶46.  There is no evidence – nor could there be – that David Rosen was given any discretionary authority by the citizens of New York.

Nor do the facts and circumstances of this case satisfy the second prong of the analysis. All of David's conduct in connection with this case was done for the benefit of the MediSys hospitals. David received no personal benefit for his actions in connection with this case, and any benefits from these relationships would have flowed to not-for-profit healthcare institutions and the communities they served. Moreover, as the evidence at trial established, David informed others of the consulting arrangements with Seminerio and Boyland, Jr. (see Tr. at 907:20-908:7 599:4-20; Gov't Ex. 2100B), and that Kruger was following the Compassionate Care contract (see Gov't Ex. 3302; Tr. at 1271:24-1272:4). Thus, there can be no allegation that David abused the trust of the hospitals, or those with whom he worked. Accordingly, there should be no enhancement under U.S.S.G § 3B1.3.

Thus, if the Court finds the Guidelines to be applicable and accepts our guidelines calculation, David Rosen's Total Offense Level is 32 and the applicable guidelines range is 121 to 151 months. However, a sentence under within this Guidelines range would be inappropriate in this case. If the Court is inclined to apply a Guidelines sentence, we submit that a number of downward departures are warranted for all the reasons discussed herein. Specifically, downward departures would be appropriate because of the distinctions between this case and the typical bribery case, the fact that David did not seek nor receive any personal benefit, David's 40-year career in which he dedicated himself to providing quality healthcare to underserved and under-privileged populations, and because the enhancement for the "gain/loss" amount under U.S.S.G. § 2B1.1 overstates the seriousness of the offense. See, e.g., United States v. Thorn, 446 F.3d 378, 391 (2d Cir. 2006) ("The imposition of a sentence outside the applicable Guidelines range pursuant to § 5K2.0 is appropriate where 'certain aspects of the case [are] found unusual enough for it too fall outside the heartland of cases' within that Guideline.") (quoting Koon v. United

States, 518 U.S. 81 (1996); U.S.S.G. § 2B1.1 Note 19(C) ("There may be cases in which the offense level determined under this guideline substantially overstates the seriousness of the offense.  In such cases a downward departure may be warranted.").

As this Court noted in United States v. Adelson, 441 F. Supp. 2d 506, 515 (S.D.N.Y. 2006) (JSR), "where…the calculations under the [G]uidelines have so run amok that they are patently absurd on their face, a Court is forced to place greater reliance on the more general considerations set forth in [S]ection 3553(a), as carefully applied to the particular circumstances of the case and the human being who will bear the consequences."  We believe this is such a case.  Accordingly, the remainder of this memorandum is addressed to the other enumerated factors in Section 3553(a).

## III.     DAVID ROSEN'S PERSONAL HISTORY

David Rosen was born on ████████ 1947, and is the eldest of four children born to Benjamin and Ruth Rosen.  Benjamin was a bus driver and, later, a supervisor for the New York City Transit Authority.  David's mother, Ruth, despite having never finished her high school education, held a variety of jobs as her children grew up, including working as an assistant in an elementary school, and a school bus driver.

David, his two brothers, Stephen and Alan, and his sister, Lisa, were raised in Laurelton, Queens.  David and his siblings enjoyed a close relationship, which has continued into adulthood.  David, as the eldest, was and is a source of support, comfort, and leadership for his brothers and sister.  It is David that his siblings turn to in times of need and crises. See Exh. 3,

Letter from Lisa Shemesh, David's sister; Exh. 4, Letter from Alan Rosen, David's brother; Exh. 5, Letter from Stephen Rosen, David's brother.[5]

David attended public school in Queens.  Knowing that his family's finances were stretched fairly thin, David began working at the age of 13 to save for college.  He held numerous jobs, including working as a lifeguard and a concession stand attendant.  David was an excellent student and graduated from Andrew Jackson High School at the age of 16, after skipping a grade in middle school.

After graduating from high school, David attended Queens College for one year, which he paid for himself with the money he had saved from his various jobs.  After his first year of college, David transferred to Cornell University where he received an academic scholarship. David continued to work to support himself.  During the school year, David worked as a waiter in a fraternity house, in the Cornell libraries, and serviced vending machines.  During the summers, David returned to Queens and worked a variety of jobs, including as a vendor at Shea Stadium, an elevator attendant at a construction site, and working for the Transport Workers Union Health Benefit Fund.

David graduated from Cornell in 1968 with a B.S. in Industrial and Labor Relations.  He continued his education by earning an MPA at the Sloan Institute of Hospital Administration, a division of Cornell's Graduate School of Business and Public Administration.  David received a U.S. Public Health Service Traineeship, a competitive grant that paid his graduate school tuition and provided a small stipend.  He graduated from his master's degree program in 1970 and was immediately hired by Jamaica Hospital as Assistant Executive Director.

---

[5] The letters from David's family, friends, and colleagues cited herein are attached as exhibits.  In addition, we are providing an appendix of additional letters that have been submitted on David's behalf that are not cited in this memorandum.

In addition to his studies, David served in the Air Force Reserves beginning in 1969. David served on weekends and for certain weeks during the summers in a medical service squadron.  David achieved the rank of First Lieutenant and was honorably discharged in 1975.

During this time period, David married his wife (now of 40 years), Candice Rosenberg ("Candi"), and started a family. David and Candi met and began dating during their sophomore year in college.  They were married on October 31, 1971, and have two daughters together; Caryn, who was born on ███████ 1973, and Danielle, who was born on ███████ 1976.  After Caryn was born, Candi, who received an MBA in 1972, stayed home to raise her children.

As discussed in detail below, David's job at Jamaica Hospital monopolized much of his time.  Nevertheless, David and his daughters are extremely close.  David and Candi emphasized hard work and dedication.  As Caryn explains, "While my parents were not strict with certain things, they would not compromise on work ethic…My father always demonstrated his incredible work ethic to us, whether it was driving to work in Queens from our home in dangerous snowstorms, routinely working very late hours, often foregoing lunch on a busy day and eating dinner at 10 pm or later and then turning around to get up at 6am for a meeting, or curtailing or entirely foregoing family vacations if issues arose at the hospital that required his attention."  Ex. 6, Letter from Caryn J. Ettinger.

When Caryn and Danielle were growing up, David made sure that he was available to help them with their homework and tried to attend their soccer and softball games as often as possible.  Throughout the course of his career, David made many personal sacrifices, foregoing vacations and missing family events,  However, David made sure to find the time for a week-long family vacation each year.  He cherished this family time but also felt the obligations he believed he owed to JHMC.  He checked in with the hospital frequently during these times and

made sure that he was available if he was needed for any urgent matters.  David's family

understood his dedication to the hospital, and viewed the hospital and David's co-workers as part

of their extended family.  See, e.g., PSR at ¶ 72 (David's daughter Caryn explained to Probation

that David's family "viewed his peers, colleagues, and much of the staff [as their] 'family'").

David's availability and dedication to his daughters extended beyond their childhood.

While in law school Caryn turned to her father for guidance and support.  As she explains, "[M]y

father was my biggest cheerleader.  He was always there to support and encourage me…Despite

his increased obligations to the hospitals as he took on greater responsibilities there, my father

never ignored my call any time of day or night and always found time for me." Exh. 6.

Caryn is an attorney who works at a boutique real estate law firm in Manhattan.  She is

the mother of one 5 year old son, D█████  Caryn recently went through an acrimonious divorce

that was painful for her and D█████  It was David that helped them cope with the ordeal, both

emotionally and financially.  Since the divorce, David has stepped in to act as a father-figure to

D███.  Danielle is married and the mother of J█████ who is 4 years old, and B█████ who is 2.

David is a doting and loving grandfather to all three of his grandchildren.

In recent years, David's wife, Candi, has become more dependent on David.  Candi

suffers from a number of health-related issues.  In 2008, Candi was diagnosed with ████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████  In 2010, ████████████████████████

█████████████████████████████████████

████████████████████   Her numerous medical issues have impacted her mobility and her general quality of life, and leave her dependent on David to get around and perform daily household tasks.  See Exh. 7, Letter from Candice Rosen.

## IV.   DAVID ROSEN'S WORK HISTORY

David committed more than 40 years to Jamaica Hospital.  His relationship with JHMC began in the summer between his graduation from college and the first year in his master's program, when he found an internship position for himself at JHMC.  David returned to JHMC during the summer between his first and second years in graduate school for a required administrative internship, rather than waiting for Cornell to arrange for such an internship at one of its major academic affiliates in Manhattan.  At the end of that second summer, David was offered a position at JHMC upon graduation from the MPA program.

### A.   The Rebuilding and Expansion of Jamaica Hospital

David joined JHMC full-time in 1970 as the Assistant Executive Director, the third in command.  After just three years, David was promoted to Associate Executive Director, and held that position until 1975.  In September 1975, the Board of Trustees dismissed the then Executive Director, and named David, at the age of 27, as the "Acting Executive Director."  In February 1976, with the support of the physicians at the hospital and the Board of Trustees, David was officially named as the Executive Director of JHMC (later, as the convention in the industry changed to corporate titles, his title was changed to President and CEO).

At that time, JHMC was a 284-bed facility that consisted of three wings, built in 1923, 1953, and 1963, respectively.  It was losing money, and the physical plant was old, dilapidated, and inadequate.  As described by Jacqueline A. Holley, the current Vice President of Nursing

22

and Patient Care Services of JHMC, who as been employed at the hospital for the past 30 years:
"The Emergency Department was so antiquated that we sometimes had to transport patients outdoors, rolling stretchers along the Van Wyck Expressway in order to get patients from one part of the hospital to the next."  Exh. 8.  Shelia Vann, a nurse employed at JHMC since 1974, also describes the conditions at the old hospital building:

> [T] he hospital was in shambles.  The basement floor had so many holes in it that we had to be careful when walking along this corridor.  We had only one elevator for visitors and one for service use.  A dumbwaiter was used for food and sterile supplies/instrumentation.  Each unit had only one bedpan hopper in the soiled utility room.  There were no bathrooms in the patients' rooms.  This meant we had to walk the entire length of the corridor to empty bedpans, regardless of their contents.  Many days we worked without sufficient supplies to care for our patients…Whenever it rained the Emergency Room flooded.

Exh. 9.

Similarly, Bruce Flanz testified at the trial about the inadequacies of the old hospital building, stating that the electrical system was so insufficient that with too many ventilators plugged in the hospital would suffer a power failure, there was no air conditioning, and the plumbing was unreliable.  See Tr. at 995:12-996:13.

The hospital's finances also were in shambles; there were ongoing losses and little in the way of systems or analytical tools to understand the context for the losses.  David had to determine where the losses were coming from and how best to ensure that the hospital served the needs of the local community.  The deficiencies in the physical plant discouraged patients with insurance from utilizing JHMC.  In addition, the neighborhood in which the hospital is located was changing at the time.  David took the time to study the demographics of the area and discovered that as white middle class families moved out to the suburbs, blue collar families of different ethnicities and lower income individuals filled the surrounding neighborhoods.  It

became clear that JHMC served a disproportionate number of uninsured patients and was increasingly dependent on Medicaid.

These patients were more likely to use the emergency room as the source of their primary care, which is the most costly care provided by the hospital.  Many doctors practicing at the JHMC (the same doctors that had supported David's bid to become CEO) encouraged him to close the emergency room and run the hospital as more of a private facility.  David believed such thinking was inconsistent with the hospital's reasons for existence and wanted JHMC to adapt to serve the needs of the changing community.  Accordingly, he took steps to expand the emergency department and JHMC's participation in the 911 ambulance system.  This was the beginning of what can only be described as David's life-long mission: to provide access to high quality health care to the people that needed it most, regardless of their ability to pay.  See Exh. 10, Letter from Lee Perlman, President, GNYHA Ventures ("For David, providing quality care to New York's most vulnerable residents was nothing less than a personal crusade."); Exh. 11, Letter from Ann Corrigan, Director of Planning for MediSys, ("David's untiring work…was motivated by his often-voiced belief that income, education, race, and ethnicity should have no bearing on whether people have access to high quality healthcare right in their own communities....").

In 1978, given the hospital's physical and financial condition, the Health Systems Agency of New York City (the "HSA") recommended that JHMC be closed and converted into a clinic.  David believed closing JHMC would be a tremendous disservice to the surrounding communities.  Indeed, JHMC served an area that had been designated by the federal government as a "Medically Underserved Area" and a "Health Professional Shortage Area."  Accordingly, David and his management team organized the local community, elected officials, and its

employees to oppose the HSA's recommendation.  That opposition culminated in a public

hearing in 1980, in which numerous public officials and community leaders spoke in favor of

keeping the hospital open.  The HSA's determination was overturned.

David and his management team understood that if JHMC was to continue to remain

open and provide high quality healthcare to its patients, the hospital would have to be rebuilt.  In

fact, the New York State Department of Health ("DOH") was willing to grant a Certificate of

Need for a replacement building, but only if JHMC could raise $15 million in equity within 90

days.  The problem, of course, was that a hospital like JHMC had no ability to qualify as a credit

worthy borrower to rebuild its physical plant.

At the time, there were no systems in place at the federal, state, or city level that

compensated hospitals like JHMC for providing care to indigent and uninsured patients.  David

immediately began advocating for a state-wide pooling mechanism to help offset some of the

losses JHMC and similar hospitals incurred as a result of the populations they treated.  In the

early 1980s, David and others were successful in getting the State to pass temporary measures to

reimburse hospitals for some of the costs associated with caring for indigent populations,

including the Emergency Hospital Reimbursement Program and the Transitional Hospital

Reimbursement Program.  Both of these programs provided limited funding for hospitals but

were temporary programs, and not designed to address the sustained losses these types of

hospitals faced.  In 1983, the creation of bad debt and charity care pools was the State's first

attempt to develop a permanent program to address hospitals' concerns about uncompensated

care.  The pools were funded by a surcharge on inpatient hospital rates, which were then pooled

together by region and redistributed to hospitals according to their level of bad debt and charity

care from the previous year.  David became a passionate advocate of the pooling mechanism that

was ultimately adopted and was the CEO most identified with this issue.  See Exh. 12, Letter

from Raymond Sweeney, the former Director of the Office of Health Systems Management at

the New York State Department of Health ("David's advocacy was critical to the design of the

State's Medicaid reimbursement system…[including the] Bad Debt and Charity Care

[Pools]…[and] insure[d] that the system that was created was fair and progressive....").

These attempts by the State to address a major problem for JHMC and other similarly

situated hospitals were an important step forward; however, they addressed operating funds, not

capital needs.  With a methodology in place to address the key driver of operating losses, David

and his management team, along with the CEO of Bronx Lebanon Hospital, pursued a

methodology that would allow safety net hospitals to access the capital markets.

By 1985, David, together with his management team and lawyers, had crafted a

legislative proposal that would provide a credit enhancement so that distressed facilities, like

JHMC, could rebuild by having tax-exempt bonds issued on their behalf by the appropriate state

agency (now the Dormitory Authority of the State of New York ("DASNY")).  This piece of

legislation, known as the Secured Hospital Capital Financing Program (the "Secured Financing

Bill"), allowed the bond holders to look to the State if any of the mortgage holders (the hospitals)

should default on the bonds.

The Secured Financing Bill was passed and signed into law on December 31, 1985.

JHMC was one of the first hospitals to rebuild its entire facility under this program.  In 1987,

JHMC borrowed $105 million for the construction of a full replacement hospital that increased

its bed count to 317 (an increase of 33 beds) and added approximately 262,000 square feet of

space.  David was involved in virtually every aspect of the reconstruction project, down to the

size of the brick used.  This hands on approach resulted in the construction being completed

ahead of schedule and significantly under budget.  See Exh. 13, Letter from Frederick Beekman,

Vice President of Ambulatory Care at MediSys ("Mr. Rosen personally oversaw the rebuilding

of the hospital, attending almost all construction project meetings so that critical decisions would

be made in a timely manner to prevent delay and avoid cost overruns.").  In fact, because of the

success of the project, David was able to obtain DOH approval for an additional floor, with no

increase in construction cost.

In June 1989, in the span of eight hours, all of the patients at JHMC were moved from the

old hospital into the new building.  Ms. Holley describes David's role in that process:  "During

our transition to the new building, a project that came to fruition through [David's] hard work; he

helped to transport patients and equipment from one building to another in an eight-hour period

with no incident.  I know few CEOs that would engage themselves at the level in which they

would roll up their sleeves and work alongside his workers, pushing stretchers."  Exh. 8.

The new hospital building provided state of the art facilities to the patients and a new

sense of pride to employees of JHMC.  See Exh. 9 (describing how the employees and

community have "a state of the art hospital with every service needed to save lives.  We became

proud to be employees of the new Jamaica Hospital Medical Center."); Exh. 14, Letter from

Elmer E. Ariza, MS (ASCP), Laboratory Administrator and Supervisor of the Blood Bank at

JHMC, ("I feel very proud to work at Jamaica Hospital with a Level I Trauma Center preferred

by police officers and firefighters injured while on duty.").

In 1993, with the savings from the original construction project and additional grant

money but without any additional borrowing, David and his management team started on the

next phase of construction.  The old hospital building was demolished and a new 130,000 square

foot building was constructed in its place.  The new building provided 70 additional revenue producing beds, including 50 psychiatric beds and a 20 bed traumatic brain injury unit.

Over the years, David also oversaw additional construction at JHMC, such as a ten-story, one thousand car garage in 2001, which addressed concerns from patients, employees, and the hospital's neighbors about parking in the area surrounding JHMC, and, in 2002, a 25,000 square foot addition to the hospital that included a new maternity suite with labor, delivery, and recovery rooms, and a pediatric emergency department that receives over 30,000 annual visits.

Following the rebuilding of JHMC, the hospital began to rapidly increase volume and market share.  See Ex. 13 (noting that after the completion of the first round of reconstruction visits to the emergency room increased from 35,000 annually to over 85,000 annually, hospital discharges went from 12,000 to over 23,000, and obstetric deliveries more than doubled, from 1,200 to over 3,000).  Indeed, JHMC achieved profitability for a number of years following the reconstruction of the hospital.  However, its ability to remain profitable while serving a largely uninsured and underinsured community that required expensive services, such as a trauma center, a 40 bed maternity unit, and extensive ambulatory care services remained tenuous. Nevertheless, David continued to be committed to expanding services to the needy community served by JHMC – not shrinking them.  David undertook a number of projects in an effort to help JHMC not just survive but thrive in its environment.

First, recognizing that patients that enter the hospital through the emergency department typically incurred the highest costs, David endeavored to bring healthcare into the communities that most needed them.  Starting in the mid-1990s, he oversaw the approval, financing, and construction of thirteen ambulatory care centers in neighborhoods that previously were underserved, such as East New York, St. Albans, Hollis, Richmond Hill, Ozone Park, Jamaica,

Astoria, Howard Beach, and Flushing.  These clinics were designed to provide access to primary care services without reliance on the costly emergency room.  As described by Daniel Sisto, the President of HANYS, this was one of David's "exhaustive efforts…to solve a primary care access problem when the financial result…would only mean deeper losses, but the community result was a seemingly miraculous solution to a lack of quality care."  Exh. 15;  see also Exh. 16, Letter from Ronda Kotelchuck, CEO of the Primary Care Development Corporation (describing David as a "visionary in understanding the importance of primary and preventive care access to residents of the…community and how to configure services to meet this need").

The clinics were populated with the primary care physicians who completed their training at JHMC's Family Practice Residency Training Program, the first program of its kind in Queens. JHMC was one of the earliest hospitals in New York to hire "hospitalists," full time physicians who were assigned to providing inpatient care to the many Jamaica inpatients who had no private physician.  These hospitalists were there to oversee the inpatient care of these patients, assuring that decisions were made early in the process and coordinating the delivery of various services, such as radiology and laboratory.  The hospitalists became the anchors of the graduate medical education teaching programs.

The hospitalist program led to the development of a faculty practice plan, which became known as TJH Medical Services, P.C.  Full time salaried hospital based physicians managed the care of patients who were admitted and did not have their own private physicians.  TJH was created to provide practice space and office management to the MediSys faculty physicians.  By March 2011, TJH had over 700 MediSys related physicians, making it one of the largest practices in the New York City region.  As described by John S. Hong, the former Chairman of the Department of Family Practice and Community Medicine Executive at Catholic Medical

Center of Queens and Brooklyn, and a competitor, David "transformed" an "ailing institution" into "a vibrant medical center…[that provides] community access to medical and mental health services for all in a region that had been sorely afflicted of available resources."  Exh. 17.

Second, David expanded JHMC by purchasing properties surrounding the hospital as they became available.  These buildings were used in a number of ways, including as administrative offices, which meant the space in the hospital building could be used almost exclusively for patient care, space could be rented out to tenants as a method of generating additional income for JHMC, and at least in connection with one building, JHMC received as much as $150,000 in revenue annually from certain billboards on the building.

Third, David anticipated the growth of managed care, including Medicaid Managed Care. The State adopted legislation that made managed care mandatory for all Medicaid recipients. Having headed the GNYHA's task force on Medicaid Managed Care, David joined with 17 other hospitals in a joint venture to form one of the first hospital owned managed care companies, HealthFirst.  This new entity became licensed to take risk on Medicaid enrollees as an insurer. HealthFirst is now the largest Medicaid managed care provider in New York and MediSys still benefits from its participation.

While this new entity provided critical mass to impact on evolving state policies, it was also unwieldy because many of the larger academic medical centers that were involved were not anxious to enroll their fee for service Medicaid patients, let alone, take risk.  Because of the differences among the members in HealthFirst, David and his management team also formed another Medicaid managed care company, Neighborhood Health Providers ("NHP").  This time, JHMC partnered with only two other similarly situated hospitals that had the same motivations and concerns as JHMC.  Although NHP was poorly capitalized by its distressed hospital owners,

enrollment in NHP grew rapidly.  A separate management company, Royal Health Care MSO was created to provide management services to NHP and other insurance companies.  The creation of NHP and Royal created an additional source of revenue and patient care opportunities for JHMC.  Inasmuch as the conversion to managed care was now mandatory for all Medicaid recipients, David's leadership in successfully implementing this new law helped produce significant savings for the state.  In recognition of his leadership efforts, David was appointed by the New York State Senate to serve on a DOH advisory panel on Medicaid Managed Care.

Finally, JHMC expanded into other health service related businesses, such as a billing and collection company, FRR, which pursued uncollected accounts for TJH and the MediSys hospitals.  The physician practice revenues collected by FRR were shared by the physicians, providing a supplement to their meager hospital salaries, and the hospitals' portion, to cover rent or clerical staff and offset the costs of the hospitalist and teaching programs.

As these additional ambulatory care centers and business interests were being formed, David, along with his management team and lawyers, decided that it made sense to create a corporate entity that could be the "parent" to these related businesses.  Thus, MediSys Health Network was formed.  MediSys, also a not for profit, became the sole corporate parent of JHMC and the majority of its affiliated nursing homes, ambulatory care centers, other businesses, and, later, its affiliated hospitals.

### B.    MediSys's Expansion to Flushing Hospital

As David Rosen was busy at work ensuring that JHMC remained open to serve its communities, other hospitals in Queens were not faring so well.  In June 1998, New York Hospital Medical Center of Queens ("New York Hospital"), the then managers of Flushing Hospital ("Flushing"), filed a bankruptcy petition for Flushing, and four months later announced

that it intended to liquidate Flushing Hospital.  Flushing's doctors, union leaders, and creditors consulted with David about the prospects for saving Flushing.  Because it was clear that a prospective new operator would need cash to fund operations and negotiate a settlement with Flushing's Creditors' Committee, JHMC was not the only hospital that Flushing's stakeholders approached.  Indeed, a number of more financially stable hospitals were also approached but turned down Flushing's request for help.  David, however, saw it as an opportunity to help colleagues and another Queens community by offering leadership.  In March 1999, with the approval of the DOH and the bankruptcy court, JHMC's management, with David at the forefront, were given a 45-day interim management contract for Flushing.

Flushing, at the time, was a 250 bed hospital, with approximately 1,500 employees, and hundreds of voluntary and salaried physicians.  The exit of New York Hospital left Flushing with virtually no management structure.  Indeed, on March 11, 1999, the day that David and his management team arrived at Flushing, only one department head remained – the director of engineering – and there were wholesale vacancies in rank and file positions, such as billing clerks, registrars, and infection control personnel.  The team from JHMC discovered appalling conditions at Flushing.  Flushing's ambulances were only bringing about 50% of their patient pick ups to the hospital, the hospital was failing to send out any bills, and on at least one occasion, a nurse had given a patient who had come in for treatment $5 to go to another hospital rather than contacting the patient's HMO for the necessary approval to treat the patient.

David and his team threw themselves into the day-to-day management of Flushing.  They took on the duties associated with their respective job titles at Flushing, in addition to their duties at JHMC.  No additional management personnel were added.  Despite the additional work load, David believed the key to a turn around was to import the existing JHMC culture.  Within the

first 45 days, David and his team were able to renegotiate the collective bargaining agreements with Local 1199, the healthcare workers' union and the New York State Nurses Association, resulting in a savings of millions of dollars.  They also were able to obtain a temporary license for an inpatient psychiatric unit that New York Hospital spontaneously shut down.  At the end of the initial 45-day period, Flushing's Board of Trustees renewed the interim contract.  David and his team were now responsible for the survival of two much needed but underfunded hospitals.

David also had to deal with the extraordinary challenges that go along with managing an institution that was in bankruptcy.  These challenges included negotiating with vendors and other creditors who were not willing to risk extending credit to Flushing, implementing management and financial reporting systems that permitted him to understand how and where cuts and savings could be made without affecting the quality of care and level of service provided by the hospital.

Flushing had been starved for capital for years, and much of its equipment was obsolete and not properly maintained.  The Department of Housing and Urban Development ("HUD"), which insured Flushing's mortgage, embraced David and his team, and ultimately released several million dollars in mortgage reserve funds to address emergency structural issues and failed systems.  David was invited by HUD on several occasions to address HUD Regional executives from across the country on health care policy and management issues.

Within a relatively short period of time, David and his management team stabilized Flushing's operations; they reopened an additional 43 beds, increasing Flushing's capacity to 293 beds, and with the DOH's approval opened new services, including an inpatient psychiatric unit.  Once again, rather than cutting services and care to a needy community, David found a way to keep a much needed hospital open and expand the services offered.

David and his team devised a Plan of Reorganization for Flushing, which was agreed to by all of Flushing's stakeholders, the DOH, HUD, and was approved by the bankruptcy court. Under the terms of that plan, MediSys became the sole corporate member of Flushing, and David and his management team were appointed as corporate officers.  Under David's management, Flushing emerged from bankruptcy within fourteen months.  Then HUD Secretary, Andrew Cuomo, officiated at a large ceremony at Flushing in recognition of its emergence from bankruptcy, commemorating the rescue of a vital community resource, and 1,500 jobs.  See Exh. 13; see also Exh. 18, Letter from Fred Fu, the President of Flushing Development Center, (describing David's "heroic exercise" to prevent "the failure of…[Flushing]" which would have caused a "devastating blow to healthcare access" and "enormous economic hardship for the workers and the community").

### C.    MediSys's Expansion to Brookdale Hospital

On the same day Flushing's Plan of Reorganization was approved by the bankruptcy court, the DOH and DASNY asked David if MediSys would be willing to take over the management of Brookdale Hospital and Medical Center ("Brookdale"), which had lost $130 million over the previous three years.  As Mounir Doss, the Executive Vice President and CFO of MediSys, explains, the state requested MediSys's assistance "because of David Rosen's reputation within the [h]ealthcare [i]ndustry…[as] a smart, hardworking and dedicated professional who was capable of putting together an equally dedicated team to work together under the most difficult circumstances."  Exh. 19.

In June 2000, David and his team once again heeded the call for help and stepped in where others would not.  This challenge was herculean. Brookdale consisted of 530 acute care beds (much larger than JHMC or Flushing), 448 skilled nursing facility beds, an assisted living

facility, a large ambulatory care operation spread over six facilities, a Level One Trauma Center, a Level Three Neonatal ICU, and an emergency department that received over 100,000 visits annually.  Located in the Brownsville section of Brooklyn, it served (and still serves) an impoverished community with many surrounding areas federally designated as "Medically Underserved Areas" and "Health Professional Shortage Areas."  Brookdale had a negative net worth of $140 million, no cash, and systems and equipment that were in advanced states of failure.  Moreover, there was substantial labor unrest at Brookdale, which manifested itself in frequent work stoppages and a recurring "occupation" of the executive offices by hundreds of employees.

In short, Brookdale was broken.  It needed to be reorganized, re-energized, and its mission redefined.  Rather than being overwhelmed or intimidated by these challenges, David thrived on them.  He viewed this as an opportunity for these three struggling hospitals – JHMC, Flushing, and Brookdale – to consolidate and rationalize services, to increase access to quality health care to underserved, uninsured, underinsured, and needy communities, and to gain more leverage with managed care companies.  Once again, David and his senior team made the decision to personally assume their respective executive roles at yet another troubled hospital. As David and his team assumed the day-to-day management and operations of Brookdale – and continued to manage and operate JHMC and Flushing – they looked for ways to cut costs without sacrificing services, quality of care, or the jobs of the employees.

In September 2000, MediSys became the sole corporate member of Brookdale, and David and the other members of the executive management team became corporate officers.  The MediSys team was able to stabilize Brookdale's operations and reached break even status by the end of its first full year, without layoffs.  In the subsequent six years, when taken as a whole,

Brookdale was able to regain census and make modest profits.  This incredible turn around was the result of the hard work and dedication of David and his management team.

MediSys's take over of Brookdale was not the last time the DOH came to David for assistance.  In April 2001 and June 2002, MediSys, under David's leadership, was asked by the Commissioner of Health to temporarily take over the management of two infamous adult homes, Leben Home in Queens and Seaport Manor in Brooklyn.  Both were featured in exposes by the New York Times, which were highly critical of the DOH.  Although the operations of these types of facilities were not within David's or MediSys's direct experience, David did what he had always done – he readily accepted the responsibility, and without requesting a management fee for MediSys.  David organized a team of professionals from several MediSys entities and they went to work.  In both cases, a tremendous effort was expended to provide stability for the residents of these homes.

### D.  David's Role and Leadership at the Hospitals

As the President and CEO of three urban hospitals serving largely indigent populations, David's skill set needed to be – and was – extremely broad.  Although his primary responsibility was the management of the institutions and their more than 10,000 employees, that task required David to have knowledge and understanding of virtually every department in the hospitals.  Some of the issues he confronted on a daily basis were personnel matters, malpractice cases and insurance, community activities and perception, union concerns, issues involving the hospitals' more than 100 different regulatory agencies, construction, financial and productivity analysis, and equipment acquisitions and maintenance.

David's management and leadership style is evidenced in the numerous letters sent by his friends and former colleagues.  David led by example and instilled in his employees a desire and

willingness to do the right thing for all of the communities served by JHMC, Flushing, and

Brookdale.  See, e.g., Exh. 1 (explaining that David stayed at JHMC because he viewed the

hospital as "his life's work" and noting that so many of JHMC's employees stayed because they

"all felt the same while working for [David]").

First and foremost, David expressed in word and deed that his and the hospitals' primary

concern was the safety and wellbeing of the patients.  See Exh. 20, Letter from Carol Farrell,

RN, BS, MSA, the former Head Nurse of the Emergency Department at JHMC (describing

David's message as "always clear, Patient Care was utmost on…[the] agenda").  This belief was

demonstrated at every level, from dealing with particular patients' needs, to addressing what

equipment should be acquired or programs pursued to provide the best healthcare to the patients,

to policy decisions about the patients that would be seen, even at the hospitals' private practices.

Dr. Emil Silberman, the Assistant Director of the Emergency Department at JHMC,

describes the attitude of the people at JHMC towards their patients as a result of David's beliefs

and actions:

> In Jamaica Hospital I found different attitudes of compassion, human
> dignity and care extended to everyone who came through the doors.  Even
> the homeless patients who were often brought to [the Emergency
> Department] without true medical emergency, were never denied a shelter
> at night, hot breakfast in the morning and clean clothes to wear.  Patients
> who couldn't afford to buy their basic medicines (antibiotics or asthma
> pumps) were given free prescriptions upon discharge, dispensed by
> administrative approval…those attitudes were cultivated by senior
> administration, headed by Mr. Rosen…he cared for the underprivileged
> patients and the poor community we were serving.

Exh. 21.

Marybeth Martin, David's former executive assistant at Flushing, recalls David's

dedication to patient care in her letter and his response to a single patient in need:

> Mr. Rosen was at Flushing Hospital late one afternoon.  A Hispanic
> woman came into Administration with her four little children, sobbing and

> the side of her face was swollen…she had an infection and needed her tooth pulled, but…our Dental Clinic had referred her to a City Hospital because she did not have the money to pay and had no insurance; she was an illegal immigrant…She asked if she could get just one of the codeine pills [that the clinic had prescribed for her], to alleviate the pain until the morning when she could go to another facility.  I…explained the situation [to Mr. Rosen] and asked if he would sign off on the medication to give her the full [prescription]…Mr. Rosen said absolutely not [and] then instructed me to go to the Dental clinic, tell them he wanted the patient's tooth pulled, the medication given to her, along with any follow-up appointment and all of it was to be at the expense of Flushing Hospital and the woman was not to pay a penny.  He stressed to me that we are a Hospital, in the business of helping people, no matter what their status or ability to pay is and that we all needed to remember that...."

Exh. 22.

Similarly, Dr. Conrad Fischer, the Director of Education Development, Department of Medicine at JHMC, explains how for the last two years he has been permitted "to see [AIDS patients] with no insurance at the private practice at [JHMC]…entirely because of David Rosen's compassion and decency."  Exh. 23.

As explained by Dr. Elliot M. Friedman, the Director of Pediatric Emergency Medicine at JHMC, David believed his job was to find a way to obtain the equipment and services that his hospitals needed to provide the best care for the patients.  See Exh. 24 ("On many occasions, [David] encouraged me to advise him as to what I needed to care for the 30,000 children we see in the emergency department, regardless of cost.  He would say that it was my job to ask and that it was his job to figure out how to obtain it – not whether to obtain it.").  Similarly, Dr. Sabiha Raoof, the Chairperson of Radiology at JHMC and Flushing, credits David's dedication, commitment, and vision for creating the state of art facility that JHMC is today.  Exh. 25.  David also supported attempts to establish new medical programs to benefit patients.  A number of these programs proved to be quite worthy and beneficial.

Moreover, David recognized the hospitals' roles within their respective communities. For example, after taking over Flushing, David formed a community advisory board to assist him in developing programs and services for the culturally diverse community served by the hospital. See, e.g., Exh. 18 (explaining that David "grasped the complex needs of a multicultural community that includes many new immigrants with substantial barriers to access" and formed a community advisory board to "identify their specific needs, develop culturally and linguistically appropriate services, remove barriers to access and…disseminate information…to their communities"). David also encouraged partnerships with local community groups so as to better serve the needs of thee diverse patient population. See, e.g., Exh. 26, Letter from Rev. Jin Eun Park , President of the Won Buddhist Korean Temple; Exh. 27, Letter from George Wong, President of Buddha's Light International Association, (describing how David supported the development of pastoral care programs for Buddhist patients – one of which was the first of its kind in the country). These epitomize David's vision of a community hospital.

Second only to patient care was David's concern for his employees. See Ex. 28, Letter from Elliot Bondi, M.D., Associate Chairman of Medicine and Director of Pulmonary Medicine at Brookdale, ("Dave's loyalty to his staff showed when he said: if there is no question of patient safety, then we will do our best to work with [an employee who has having personal problems]"). Dennis Rivera, the former president of Local 1199SEIU United Healthcare Workers East, describes the frequent discussions he and David had about "the welfare and the hundreds of 1199SEIU members employed at [David's] hospitals" who "knew David cared deeply about both their personal health and professional careers." Exh. 29.

David encouraged and empowered his employees. See, e.g., Exh. 30, Letter from Moshe Y. Gunsburg, M.D. (noting that practicing at Brookdale can be "enormously frustrating and

difficult" because of the "obstacles" but that David always took the time to mentor him and helped "keep me on course with my own personal mission as a physician."

David kept his employees informed about developments in the industry and the financial issues that these and other similar hospitals faced.  He held regular meetings with medical chairpersons, directors, department heads, managers, and supervisors throughout the institutions. People were encouraged to attend and to discuss issues that were important to them and the institutions.  During these meetings, David would discuss developments in federal, state, and local healthcare issues, including the difficult financial struggles these institutions faced.  David encouraged those who attended these meetings to bring back as much information to their staff as possible.  See, e.g., Exh. 31, Letter from Laurie Horowitz, M.D. (describing meetings with medical staff in which David "would share information not only about the business of running the hospital, but also the impact of the regulatory environment on the health care industry"), Exh. 32, Letter from Robert H. Slepoy, M.D., Chairman of the Department of Anesthesiology at Flushing ("Regular weekly meetings were held with all Department Chairpersons and monthly with all Department Heads …an array of issues were discussed…keeping all Hospital personnel informed on important…matters.  These meetings were also open forums for discussion....).  Dr. Robert Smith notes that during meetings with the staff, David was "infused with pride in the work the hospital did in our urban community, honest about the difficult financial struggles we faced providing care to the uninsured and spoke of his commitment to lead and keep our hospital afloat."  Exh. 2.  David was willing to listen to new ideas that were being proposed.  "Many new projects were hatched at such meetings, such as an on site MRI Unit, a designated Orthopedic Unit for better Post-Op care…a Geriatric Unit, [and] the expansion of the Endoscopy and Emergency Departments...."  Exh. 32.

These meetings, however, were not the only times that David heard from the medical staff and department heads.  David had an open door policy and a willingness to listen to concerns and complaints that encouraged impromptu meetings.  David was also there to support his employees in times of need or trouble.  Dr. Laurie Horowitz described the support David gave to her during a trying time in her professional life:

> A few years ago there was an incident in one of my laboratories which resulted in a temporary loss of accreditation by the College of American Pathologists (CAP).  As I worked to identify the root cause of this event, Mr. Rosen never wavered in his trust in me or in his confidence in my ability as a laboratory director…When I was given the opportunity to present my case before the governing board of CAP, he insisted on flying out to Chicago with me and a colleague for an 8AM Sunday meeting. I addressed the board…on the cause of this incident and the corrective actions taken.  Following my presentation, Mr. Rosen in true leadership fashion, took the discussion to a higher level…by engaging them in a discussion of the challenges of operating an inner city, unionized hospital laboratory such as mine…The initial accreditation decision was immediately overturned....

Exh. 31.

David's support for his employees was not limited to professional matters, he was interested in his employees on a personal level as well.  Dr. Robert Crupi describes David's "kind and thoughtful attentiveness" during a period of time when Dr. Crupi was dealing with a number of family issues, including ███████████████████████████ Exh. 33.

Similarly, Ole Pedersen describes David's "genuine concern" and non-judgmental questions and conversations while Mr. Pedersen's younger son was going through a difficult time during which ████████████████████ Exh. 1.  Hans Waldvogel, Director of Engineering at JHMC describes how David encouraged him and approved an extended leave of absence so that he could go to Guatemala and help build classrooms, bathrooms, and housing for a school that bussed children in from the Guatemalan dumps.  See Exh. 34.

David's concern for his employees and his kind and compassionate nature came through when it mattered most. Dr. Jeffrey Weinberg explains how his father, Dr Barry Weinberg, who served as the Chairman of Dentistry at JHMC, benefitted from David's kind and compassionate nature when he was diagnosed with ███████████

> [David] told my father that he could continue to work for as long as he wanted with the full support of the hospital. He also arranged for one of the hospital's drivers to take him to and from his ███████████ This made life a lot easier for my father as he suffered with this terrible disease. This behavior is not what I would expect from most hospital administrators, who are only concerned with the bottom line.

Exh. 35; see also Exh. 36, Letter from Anna Teresa Franquiz (Walcott) (describing how David visited her while she was in the hospital: "This was not the busy Hospital C.E.O. sitting in front of me, but a genuine, sincere person...").

Given David's leadership and his concern for patients and employees, it is understandable why so many of the letters from his employees express the same view of a man that they have each known for ten years or more. It is David's leadership that allowed them to "do so much for [their] patients, with so little." Exh. 37 , Letter from Sheryl Morgan, MS HRM. Indeed it is David's leadership qualities, his passion, and his vision that enabled him to rebuild three hospitals on the brink of their demise.

### E. David's Leadership Role in the Health Care Industry

David's leadership did not stop at the doors of his hospitals. For much of his four decade long career, David demonstrated the same passion and dedication to the health care industry at large. He attempted to improve the quality of health care and advance the interests of all underserved and indigent populations in New York and beyond. He served on the boards of the two major hospital trade associations, the Hospital Association of New York State and the

Greater New York Hospital Association, and was at the forefront of all the issues facing JHMC,

Flushing, Brookdale, and other similarly situated hospitals.

The letters submitted by David's colleagues in the healthcare field all attest to his

passion, dedication, and commitment to the vulnerable and disadvantaged communities served

by his and other hospitals.  Ken Raske, the President of GNYHA states unequivocally that "[o]f

the literally hundreds of hospital CEOs I have worked with over the last 27 years, I can say

without reservation that none was ever more committed to delivering quality healthcare to New

York's most vulnerable residents and communities than David Rosen."  Exh. 38.  Dennis

Whalen, the Executive Vice President of HANYS and the former Executive Deputy

Commissioner of Health, noted that "[t]ime and time again David strove to bring, preserve, and

improve healthcare to those who had financial and other difficulties seeking and receiving health

care services.  And… not by providing care of limited or lesser quality, but by striving to always

offer the best of care."  Exh. 39.  Pat Wang, the President and CEO of HealthFirst, describes

David as "a passionate, stubborn, articulate, and insistent voice for hospitals serving the poor and

uninsured" who was "outraged at the inequality in the [healthcare] system" and "challenged [his

colleagues] to prioritize the right of underserved communities to have the same quality of

healthcare as residents of more affluent neighborhoods."  Exh. 40.

David's advocacy efforts spanned the universe of the issues affecting medically indigent,

disadvantaged, and underserved communities.  David Rich, the Executive Vice President for

Government Affairs for GNYHA, describes David's advocacy on the issues that had a significant

impact on the communities his hospitals served:

> [David] argued passionately on behalf of trauma centers, which
> unfortunately in poor communities, are all too often filled with victims of
> violence, or preventable injury or illness.  Jamaica and Brookdale
> hospitals continue to be trauma centers despite the fact that many costs are

43

> severely under-reimbursed…[He] played a huge role in ensuring that the State invested in the health care infrastructure in low-income communities, not just in the areas served by his hospitals, but in poor areas across New York State.  He argued that State policy should support clinics in underserved areas, and was instrumental in the development of the Primary Care Development Corporation, which helps provide capital for primary care clinics…He was instrumental in the development of New York's emergency Medicaid program, which allows hospitals to bill Medicaid for emergency services provided to undocumented residents, even though the Federal government provides no financing for these services.  He also helped GNYHA develop and advocate for the creation of the Family Health Plus program, which now provides insurance for over 500,000 low-income adults who do not qualify for Medicaid.

Exh. 41.

Similarly, Joseph McDonald, the Chairman–Elect of the HANY's Board, writing on behalf of the full Board, describes how David "brought his knowledge and passion together with his CEO expertise to take on issues like managed care abuses; the lack of primary care in the inner city; the lack of a capital fund to upgrade aging plants in New York City's poverty stricken areas, and yet he maintained an alertness about different but comparable dilemmas across the health community."  Exh. 42.

David's advocacy and expertise were valued by others in the field.  James Tallon, the President of the United Hospital Fund and a former New York State Assemblyman who served as Majority Leader and the Chairman of the Health Committee, describes  David as a "respected advisor and colleague" whose "detailed knowledge and intense commitment" was valued and sought after.  Exh. 43.

From very early in his career, David was willing to fight unpopular battles to ensure that important and necessary services were provided to his patients.  Robert G. Newman, M.D. describes how David worked with him when he was serving as the Deputy NYC Health Commissioner to "overcome the grave doubts and reservations of staff and local residents alike" and develop methadone programs to treat heroin addicts because "David recognized that the

alternative… was abandonment and, for many, death." Exh. 44.  Bruce Vladeck, who was

appointed by President Clinton to head the Health Care Financing Administration (now CMS),

the federal regulator of Medicare and Medicaid programs, got to know David in the 1980s and

1990s, when Mr. Vladeck was the President of the United Hospital Fund of New York City.  He

describes David at being at the "center" of "the issues of priority concern," such as "the

provision of uncompensated care by urban hospitals, healthcare for the homeless, expanding

access to primary care in the City's low-income neighborhoods, and…the AIDS epidemic."

Exh. 45.

David's dedication and commitment to providing the best healthcare to his communities

also helped improve healthcare across the state and nationally.  As explained by Dennis Whelan,

"Despite significant financial challenges, [David's] institutions were among the first to focus on

making significant efforts to improve patient safety, and among the first to work on

standardization of care protocols – notably in stroke care where the work resulted in

establishment of statewide standards."  Exh. 39.  Dr. Jamshid Ghajar describes that "[w]ith

David's support the care for severely head injured patients in comas – the most prevalent cause

of death in severe trauma, such as car crashes – improved dramatically [at JHMC].  In fact

Jamaica Hospital was the inspiration for the now national head injury guidelines for the best

care.  David pushed for the very best for patients and that translated into best care for the whole

country."  Exh. 46.  Similarly, Dr. Kenneth R. Fretwell, Chairman of Surgery at JHMC, credits

David for "single-handedly…elevating the standards of surgical/trauma care in the borough of

Queens" by forging a relationship between JHMC and a "nationally renowned surgical training

program" that through "Dave's vision…brought the brightest surgical residents out to Jamaica.".

Exh. 47.

David and his team were also always willing to help out in times of crises.  As described by Raymond Sweeney:  "It [is] well [chronicled] that Jamaica – and MediSys wide – was always the first to send a group of volunteers to an emergency situation, whether inside the state or elsewhere.  I don't recall whether it started with September 11, 2001, but in every crisis I remember over the last decade, you could count on seeing a Jamaica or MediSys ambulance and crisis team on the scene."  Exh. 12.

In more recent years, David's concerns about patient care and the survival of these much needed institutions have led him into battles with a number of managed care companies.  As the managed care companies' role and power in the health care industry has grown, hospitals like JHMC, Flushing, and Brookdale have lacked the strength to negotiate reasonable rates for patient care.  In addition, David began to notice an extraordinary number of denials from certain managed care companies.

David brought his concerns to the New York State Attorney General, the Commissioner of Health, and the Commissioner of Insurance.  However, when he and his hospitals could not get the issues resolved through these channels, David took the next step of instituting litigations against the insurance companies.  See Exh. 48, Letter from Michael Escott, a friend and a dean at the Touro University College of Pharmacy (noting that David "spent countless hours trying to challenge and expose the injustices and unfair practices of [insurance] companies").  As these lawsuits pointed out, there was real risk of patient harm as managed care companies would deny admission and overrule the doctors and send sick patients home.  David was the only CEO willing to stand up against these insurance companies.  See Exh. 49, Letter from Barbara Gail Quackenbos, Partner at Wilentz, Goldman & Spitzer.  Indeed, one of the lawsuits that David brought alleged that insurance companies that used a specific database were underpaying

hospitals.  Ms. Quackenbos notes that this same database was "subsequently called [by Andrew Cuomo] the 'greatest scam' he had seen during his tenure [as the New York Attorney General]." Id.

David's intelligence, leadership, passion, and dedication over a forty year career earned him the respect and admiration of many in the healthcare industry.  The letters submitted by David's former colleagues describe the man who "was tireless in his work to better the health status of the urban poor" (Exh. 50, Letter of Barry R. Freedman, President and CEO, Albert Einstein Healthcare Network), "was the lone voice compelling his fellow CEOs and trade association executives to support actions and proposals that would level the playing field and entitle all to access health care" (Exh. 51, Letter from Gladys George, President and CEO, Lenox Hill Hospital), and "personified the passion towards patients and the disenfranchised that every health executive needed to emulate" (Exh. 10, Letter from Lee Perlman).  It is this man that we ask the Court to consider when imposing sentence.

## V.    FACTORS FOR SENTENCING

As discussed above, the Guidelines represent only the starting point in the Court's sentencing analysis and are only one of many factors the Court must consider under Section 3553(a).  Section 3553(a) directs courts to impose the minimum sentence necessary (a) "to reflect the seriousness of the offense, to promote respect for the law, and provide just punishment for the offense;" (b) "to afford adequate deterrence to criminal conduct; (c) "to protect the public from further crimes by the defendant;" and (d) to "provide the defendant with needed educational or vocational training medical care, or other correctional treatment in the most effective manner."  18 U.S.C. § 3553(a); see also United States v. Ministro-Tapia, 470 F.3d 137, 142 (2d Cir. 2006) ("if a district court were explicitly to conclude that two sentences equally served the

statutory purpose of § 3553, it could not, consistent with the parsimony clause, impose the higher [one].").  In addition, Section 3553(a) also directs courts to consider "the nature and circumstances of the offense and the history and characteristics of the defendant"; "the kinds of sentences available"; the Guidelines and any policy statements; and avoiding unwarranted "disparities" in sentencing.[6]  As set forth below, these factors all support a non-incarcerative sentence with a substantial community service component.

A.    **David Rosen's History and Characteristics**

The Court should consider the full breadth of David Rosen's history and characteristics in fashioning a sentence under Section 3553(a).  David Rosen is not merely a 64 year-old first time offender.  Rather, he is a man that has dedicated his entire adult life to providing access to quality health care to the neediest communities in New York City.  He was a compassionate and caring boss to the over ten thousand employees of MediSys. He is man that has never been motivated by self-interest or greed, and is consistently described as honest, forthright, humble, and having the utmost integrity. Those who worked with David attest to his honesty and integrity in each and every dealing.  See United States v. Gamez, 1 F. Supp. 2d 176, 184 (E.D.N.Y. 1998) (granting departure where he criminal conduct did "not typify the usual behavior of the defendants" and considered the defendants' lack of any prior criminal history, their "stellar work histories," and the fact that the defendants were "upstanding members of the community")

As discussed, David has spent the vast majority of his entire adult life "sow[ing] the seed[s] of compassion, tolerance and love in a community where many are afraid to venture" (Exh. 52, Letter from Victoria Moser Odusanya) so that his hospitals could continue to serve "a

---

[6] Under this standard, it may be relevant to consider that Assemblyman Boyland was acquitted by a jury for the mirror-image crime of which David has been convicted.

disproportionate number of underprivileged, poor and uninsured patients" (Exh. 50).  The people

David dealt with, whether employees, vendors, colleagues, or (at times) adversaries, during his

tenure at JHMC and MediSys, all describe an admirable, honest man whose integrity was beyond

reproach, and whose motivation was pure.  <u>See</u> Exh. 53, Letter from Gregory R. Bradley,

Executive Vice President, Trump Pavilion for Nursing and Rehabilitation (explaining how David

would not use his position to gain free services for his mother at one of MediSys's nursing

homes); Exh. 16 (describing how David, as a board member of PCDC recused himself form all

JHMC related Board proceedings so that there could be no conflict of interest).

In each and every instance described in the letters from friends and former colleagues,

when David was confronted with potential conflicts of interests, he chose to do the right thing:

> [I]n 25 years of working with [David] in a close and professional
> manner…I never saw behavior that was anything short of the highest level
> of honesty, professionalism and integrity that I grew to know and respect
> him for.  I witnessed an individual who constantly fought for equal access
> to quality healthcare for all members of our community without regard to
> ethnicity, religion, culture or the ability to pay for care.  Dave Rosen is a
> good man who worked tirelessly to do good things for the right reasons.

Exh. 54, Letter from Alan R. Roth, DO, FAAFP, Chairman, Department of Family Medicine,

Ambulatory Care, and Community Medicine, and Chief, Palliative Care Department and

Fellowship Program at JHMC.

Hans Kuenstler describes a situation in which a Fire Department Inspector approached

Mr. Kuenstler about a payoff to finalize the fire alarm system at JHMC.  Mr. Kuensteler

informed Mr. Rosen who "immediately and emphatically advised [Mr. Kuenstler] that 'we don't

do business that way.'"  Exh. 55.  One of David's mottos was "Let's do it by the book."  <u>Id.</u>

David's motivation was clear to all that had dealings with him.  "Never in a conversation

with David was there a question about what was most important – it was not himself, not the

'institution' of the hospitals he led, not the politics involved in any situation.  It was always

about the patients, their needs, and the importance of commitment to caring for those who had

less." Exh. 39.  Indeed, David made numerous personal sacrifices for the success of the

hospitals.  He was not motivated by personal gain; if he had been he could have gone elsewhere

to earn more money and prestige, and not face the burdens associated with his financially

troubled hospitals.

David even turned down the small perks that no one would have begrudged him.  In his

letter, William B. Selan, an architect that David dealt with for more than 20 years, relates the

story of how David turned down on multiple occasions Mr. Selan's offer to renovate David's

office at JHMC:

> [David's] own personal environment wherein he worked every day was
> modest way below what one would expect of a person of his professional
> stature.  His office was in a converted low income apartment house, small,
> shabby, furnished with furniture from his college dormitory at Cornell.  I
> offered to renovate his space on numerous occasions, always to be turned
> down.  'This is fine, I don't need anything more' was his standard
> response.

Exh. 56.

### B.      The Nature and Circumstances of the Offense

Sections 3553(a)(1) and 3553(a)(2)A direct the Court to consider the nature and

circumstances of the offense, and the need for the sentence imposed to "reflect the seriousness of

the offense, to promote respect for the law, and to provide just punishment for the offense."  18

U.S.C. §§3553(a)(1) and 3553(a)(2)(A).  As discussed in detail above, this is not the typical

bribery case.  See supra, Point II.  The Court should consider the factors discussed above when

conducting this analysis – namely: (1) David Rosen did not profit from the offense and was not

motivated by self-interest or greed; (2) there is no evidence that the public was harmed as a result

of the relationships between Mr. Rosen's hospitals and the elected officials; and (3) the evidence

demonstrates that Mr. Rosen was not the initiator of these relationships at issue; indeed, he was

approached in each instance by a member of the New York State legislature who had the power

to help or harm the institutions David worked so tirelessly for.  It is apparent that David was ill-

served by both his internal and external attorneys.  In addition, the Court should consider all the

good David Rosen has done in his life and all the good that he may still do if he is not

incarcerated.

Those who have worked with David over his 40 year career attest to the good he has done

for the patients and employees of JHMC, Flushing, and Brookdale.  See Exh. 57, Letter from

Jeffrey K. Frerichs, President and CEO, St. Mary's Healthcare System for Children, (David's

"life and career have made such extraordinary positive impact on the lives of so many, that their

value cannot be overstated.").

### C.    A Period of Incarcerations is Not Necessary to Achieve Either General or Specific Deterrence

Even before Booker, sentencing judges granted downward departures in cases where a

sentence within the Guidelines range was "greater than necessary" to afford adequate deterrence

and protect the public from future crimes committed by the defendant.  See, e.g., United States v.

Gaind, 829 F. Supp. 669 (S.D.N.Y. 1993) (holding that effective destruction of the defendant's

business decreased for the foreseeable future the defendant's ability to commit further crimes

and constituted a source of both specific and general deterrence).  Like the defendant in Gaind,

David Rosen poses no risk of committing future offenses and incarceration is unnecessary to

prevent him from engaging in unlawful activity in the future.  David is 64 years old and has no

prior criminal record.  He has not worked in his chosen profession since he was arrested in

March of this year, and, in light of his conviction, he will not be able to return to that profession

in the future.  Other collateral consequences created by his arrest and conviction, include David's

exclusion from New York State's Medicaid Program by the Office of the Medicaid Inspector

General, and the numerous news articles recounting his crimes.  Therefore, in sentencing David

Rosen, this Court should consider that in the future he will not, as a practical matter, be in a

position where he could engage in the same types of acts again.  <u>See</u> <u>Gaind</u>, 829 F. Supp. at 671

("[e]limination of the defendant's ability to engage in similar or related activities – or indeed any

major business activity – for some time, and the substantial loss of assets and income resulting

from [the crime] have decreased for the foreseeable future his ability to commit further

crimes…and constitutes a source of both individual and general deterrence"); <u>United States v.</u>

<u>Stewart</u>, 590 F.3d 93, 141 (2d Cir. 2009) (finding that the district court appropriately considered

the fact that the defendant will not be able to practice in his profession in concluding that the

"need for further deterrence and protection of the public is lessened because the conviction itself

'already visits substantial punishment on the defendant'" and it was not error for the district

court to consider the fact that the defendant will not be in a position to commit his offense again

in evaluating deterrence factor).

## VI.     SENTENCING RECOMMENDATION AND <u>COMMUNITY SERVICE PLAN</u>

        For all the reasons discussed above, we respectfully submit that the appropriate sentence

in this case is a non-incarcerative sentence with a substantial community service component.[7]

To that end, David has already contacted the Council of Neighborhood Organizations, Inc.

("CONO"), a not for profit community organization in Brooklyn, that has agreed to participate in

a community service project.

_____

[7] As a criminal justice sanction, community service is a well-established form of punishment, supervision, and rehabilitation used by the courts as a responsible, offender-specific sentencing alternative.  The wide endorsement of community service by the courts at both federal and state levels is attributable to individual judges who recognize hat it "is a burdensome penalty that meets with widespread public approval, is inexpensive to administer…produces public value and…can to a significant extent be scaled to the seriousness of crimes."  National Institute of Justice, Intermediate Sanctions in Sentencing Guidelines (May 1997)

For the last 30 years, CONO has provided a vast array of community service programs to senior citizens, minorities, immigrants, persons on limited incomes, persons with special housing needs, and the youth in the communities of Boro Park, Sunset Park and Kensington.  The majority of clients seeking CONO's assistance are either recent immigrants who are living at or below the median income level or senior citizens who are living on fixed incomes.  CONO's mission is to educate clients and to assist them in securing entitled benefits that will enable them and their families to achieve the highest possible quality of living conditions, and ultimately become fully-functional, self-sufficient, well-adjusted members of the community.

CONO case workers provide direct counseling assistance to their clients.  Once a client comes to the CONO office, a case worker interviews the client and determines what entitlements the client is eligible to receive, such as Public Assistance, Food Stamps, Medicaid, Medicare, Social Security, housing subsidies, etc.  The caseworker then begins the application process and retrieves whatever documentation is needed from the client to secure the service. Thereafter, the caseworker makes an appointment for the client to meet with the service provider agency and accompanies the client, if needed, to explain why the client is eligible to receive the service.[8]

David interviewed with CONO in consideration of a potential community service program.  During his interview, he learned that CONO was interested in his assistance. Specifically, David could assist the organization by providing direct counseling to clients and by providing organizational skills that are only available to them by contracts with specific professionals.  Given CONO's modest size and resources, we believe his contributions would have a potentially significant impact.  In addition, David learned that CONO has experience with

---

[8] CONO provides other services such as after school recreational, educational and counseling programs for youths, adult literacy classes and assistance with landlord tenant disputes, among other things.

the criminal justice system in supervising assignees who are completing community service

obligations, and thus would be willing to work with David's Probation Officer to whatever

extent necessary.

**VII.**   **CONCLUSION**

     Based on the foregoing, we respectfully submit that the appropriate sentence in the

instant case is probation with a substantial community service component.  We believe that such

a sentence would reflect the seriousness of the offense, the differences between this case and

typical bribery cases, and David's history and character.

Dated: New York, New York
       December 23, 2011

                          MORVILLO, ABRAMOWITZ, GRAND,
                          IASON, ANELLO & BOHRER, P.C.

              By:   /s/ Robert G. Morvillo
                   Robert G. Morvillo (RM-3132)
                   E. Scott Morvillo (SM-8234)
                   Ellen Murphy (EM-8333)
                   Robert C. Morvillo (RM-8597)
               *Attorneys for Defendant David P. Rosen*
              565 Fifth Avenue
              New York, New York 10017
              (212) 856-9600

# EXHIBITS EXCLUDED